# PITTSBURGH PRESS CO. *v.* PITTSBURGH COMMISSION ON HUMAN RELATIONS ET AL.

No. 72–419.   Argued March 20, 1973—Decided June 21, 1973

Powell, J., delivered the opinion of the Court, in which Brennan, White, Marshall, and Rehnquist, JJ., joined.  Burger, C. J.,

*post*, p. 393, and DOUGLAS, J., *post*, p. 397, filed dissenting opinions. STEWART, J., filed a dissenting opinion, in which DOUGLAS, J., joined, *post*, p. 400.   BLACKMUN, J., filed a dissenting opinion, *post*, p. 404.

*Charles R. Volk* argued the cause for petitioner.   With him on the briefs was *Ralph T. DeStefano*.

*Eugene B. Strassburger III* argued the cause and filed a brief for respondents Pittsburgh Commission on Human Relations et al.   *Marjorie H. Matson* argued the cause for respondent National Organization of Women, Inc. With her on the brief was *Sylvia Roberts*.*

MR. JUSTICE POWELL delivered the opinion of the Court.

The Human Relations Ordinance of the City of Pittsburgh (the Ordinance) has been construed below by

---

*\*Arthur B. Hanson* and *Ralph N. Albright, Jr.*, filed a brief for the American Newspaper Publishers Assn. as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Solicitor General Griswold, Assistant Attorney General Pottinger, Deputy Solicitor General Wallace, Harriet S. Shapiro, John C. Hoyle, Julia P. Cooper*, and *Beatrice Rosenberg* for the United States; by *Evelle J. Younger*, Attorney General of California, *Robert H. O'Brien* and *Carl Boronkay*, Assistant Attorneys General, and *Judith T. Ashmann*, Deputy Attorney General, for the California Fair Employment Practice Commission; by *George F. Kugler, Jr.*, Attorney General, *Stephen Skillman*, Assistant Attorney General, and *David S. Litwin*, Deputy Attorney General, for the State of New Jersey; by *Israel Packel*, Attorney General of Pennsylvania, and *Roy Yaffe* and *Michael L. Golden, Jr.*, Assistant Attorneys General, for the Pennsylvania Commission on the Status of Women et al.; by *Norman Dorsen, Ruth Bader Ginsburg*, and *Jeffrey A. Kay* for the American Civil Liberties Union et al.; by *Phineas Indritz, Elizabeth Boyer, Marguerite Rawalt, Martha W. Griffiths, Margaret M. Heckler*, and *Donald M. Fraser* for the American Veterans Committee, Inc., et al.; by *Philip J. Tierney* for the International Association of Official Human Rights Agencies; and by *Rita Page Reuss* and *Jane M. Picker* for the Women's Law Fund, Inc.

the courts of Pennsylvania as forbidding newspapers to carry "help-wanted" advertisements in sex-designated columns except where the employer or advertiser is free to make hiring or employment referral decisions on the basis of sex. We are called upon to decide whether the Ordinance as so construed violates the freedoms of speech and of the press guaranteed by the First and Fourteenth Amendments. This issue is a sensitive one, and a full understanding of the context in which it arises is critical to its resolution.

## I

The Ordinance proscribes discrimination in employment on the basis of race, color, religion, ancestry, national origin, place of birth, or sex.[1] In relevant part, § 8 of the Ordinance declares it to be unlawful employment practice, "except where based upon a bona fide occupational exemption certified by the Commission":

"(a) For any employer to refuse to hire any person or otherwise discriminate against any person with respect to hiring . . . because of . . . sex.

. . . . .

"(e) For any 'employer,' employment agency or labor organization to publish or circulate, or to cause to be published or circulated, any notice or advertisement relating to 'employment' or membership which indicates any discrimination because of . . . sex.

. . . . .

"(j) For any person, whether or not an employer, employment agency or labor organization, to aid . . . in the doing of any act declared to be an unlawful employment practice by this ordinance . . . ."

---

[1] For the full text of the Ordinance and the 1969 amendment adding sex to the list of proscribed classifications, see App. 410a–436a.

The present proceedings were initiated on October 9, 1969, when the National Organization for Women, Inc. (NOW) filed a complaint with the Pittsburgh Commission on Human Relations (the Commission), which is charged with implementing the Ordinance. The complaint alleged that the Pittsburgh Press Co. (Pittsburgh Press) was violating § 8 (j) of the Ordinance by "allowing employers to place advertisements in the male or female columns, when the jobs advertised obviously do not have bona fide occupational qualifications or exceptions . . . ." Finding probable cause to believe that Pittsburgh Press was violating the Ordinance, the Commission held a hearing, at which it received evidence and heard argument from the parties and from other interested organizations. Among the exhibits introduced at the hearing were clippings from the help-wanted advertisements carried in the January 4, 1970, edition of the Sunday Pittsburgh Press, arranged by column.[2] In many cases, the advertisements consisted simply of the job title, the salary, and the employment agency carrying the listing, while others included somewhat more extensive job descriptions.[3]

On July 23, 1970, the Commission issued a Decision and Order.[4] It found that during 1969 Pittsburgh Press carried a total of 248,000 help-wanted advertisements; that its practice before October 1969 was to use columns captioned "Male Help Wanted," "Female Help Wanted," and "Male-Female Help Wanted"; that it thereafter used the captions "Jobs—Male Interest," "Jobs—Female Interest," and "Male-Female"; and that the advertise-

---

[2] These exhibits are reproduced in App. 299a–333a.

[3] For examples of these want ads, see the Appendix to this opinion, *infra,* at 392–393.

[4] The full text of the Commission's Decision and Order is set forth in the Appendix to the Petition for Certiorari, at 1a–18a.

ments were placed in the respective columns according
to the advertiser's wishes, either volunteered by the ad-
vertiser or offered in response to inquiry by Pittsburgh
Press.[5] The Commission first concluded that § 8 (e) of
the Ordinance forbade employers, employment agencies,
and labor organizations to submit advertisements for
placement in sex-designated columns. It then held that
Pittsburgh Press, in violation of § 8 (j), aided the adver-
tisers by maintaining a sex-designated classification sys-
tem. After specifically considering and rejecting the
argument that the Ordinance violated the First Amend-
ment, the Commission ordered Pittsburgh Press to cease
and desist such violations and to utilize a classification
system with no reference to sex. This order was affirmed
in all relevant respects by the Court of Common Pleas.[6]

On appeal in the Commonwealth Court, the scope of
the order was narrowed to allow Pittsburgh Press to
carry advertisements in sex-designated columns for jobs
exempt from the antidiscrimination provisions of the
Ordinance. As pointed out in that court's opinion, the
Ordinance does not apply to employers of fewer than five
persons, to employers outside the city of Pittsburgh, or
to religious, fraternal, charitable, or sectarian organiza-
tions, nor does it apply to employment in domestic service
or in jobs for which the Commission has certified a bona
fide occupational exception. The modified order bars
"all reference to sex in employment advertising column

---

[5] The Commission specifically found that:

"5. The Pittsburgh Press permits the advertiser to select the
column within which its advertisement is to be inserted.

"6. When an advertiser does not indicate a column, the Press
asks the advertiser whether it wants a male or female for the job
and then inserts the advertisement in the jobs—male interest or
jobs—female interest column accordingly." *Id.*, at 16a.

[6] See *id.*, at 19a.

headings, except as may be exempt under said Ordinance, or as may be certified as exempt by said Commission." 4 Pa. Commw. 448, 470, 287 A. 2d 161, 172 (1972). The Pennsylvania Supreme Court denied review, and we granted certiorari to decide whether, as Pittsburgh Press contends, the modified order violates the First Amendment by restricting its editorial judgment. 409 U. S. 1036 (1972).[7] We affirm.

## II

There is little need to reiterate that the freedoms of speech and of the press rank among our most cherished liberties. As Mr. Justice Black put it: "In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our

---

[7] Pittsburgh Press also argues that the Ordinance violates due process in that there is no rational connection between sex-designated column headings and sex discrimination in employment. It draws attention to a disclaimer which it runs at the beginning of each of the "Jobs—Male Interest" and "Jobs—Female Interest" columns:

"Notice to Job Seekers"

"Jobs are arranged under Male and Female classifications for the convenience of our readers. This is done because most jobs generally appeal more to persons of one sex than the other. Various laws and ordinances—local, state, and federal, prohibit discrimination in employment because of sex unless sex is a bona fide occupational requirement. Unless the advertisement itself specifies one sex or the other, job seekers should assume that the advertiser will consider applicants of either sex in compliance with the laws against discrimination."

It suffices to dispose of this contention by noting that the Commission's commonsense recognition that the two are connected is supported by evidence in the present record. See App. 236a–239a. See also *Hailes* v. *United Air Lines*, 464 F. 2d 1006, 1009 (CA5 1972). The Guidelines on Discrimination Because of Sex of the Federal Equal Employment Opportunity Commission reflect a similar conclusion. See 29 CFR § 1604.4.

democracy." *New York Times Co.* v. *United States,* 403
U. S. 713, 717 (1971) (concurring opinion). The dura-
bility of our system of self-government hinges upon the
preservation of these freedoms.

> "[S]ince informed public opinion is the most potent
> of all restraints upon misgovernment, the suppres-
> sion or abridgement of the publicity afforded by a
> free press cannot be regarded otherwise than with
> grave concern. . . . A free press stands as one
> of the great interpreters between the government and
> the people. To allow it to be fettered is to fetter
> ourselves." *Grosjean* v. *American Press Co.,* 297
> U. S. 233, 250 (1936).

The repeated emphasis accorded this theme in the de-
cisions of this Court serves to underline the narrowness
of the recognized exceptions to the principle that the press
may not be regulated by the Government. Our inquiry
must therefore be whether the challenged order falls
within any of these exceptions.

At the outset, however, it is important to identify with
some care the nature of the alleged abridgment. This
is not a case in which the challenged law arguably dis-
ables the press by undermining its institutional viability.
As the press has evolved from an assortment of small
printers into a diverse aggregation including large pub-
lishing empires as well, the parallel growth and com-
plexity of the economy have led to extensive regulatory
legislation from which "[t]he publisher of a newspaper
has no special immunity." *Associated Press* v. *NLRB,*
301 U. S. 103, 132 (1937). Accordingly, this Court has
upheld application to the press of the National Labor
Relations Act, *ibid.;* the Fair Labor Standards Act, *Mabee*
v. *White Plains Publishing Co.,* 327 U. S. 178 (1946);

*Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186 (1946); and the Sherman Antitrust Act, *Associated Press* v. *United States,* 326 U. S. 1 (1945); *Citizen Publishing Co.* v. *United States,* 394 U. S. 131 (1969). See also *Branzburg* v. *Hayes,* 408 U. S. 665 (1972). Yet the Court has recognized on several occasions the special institutional needs of a vigorous press by striking down laws taxing the advertising revenue of newspapers with circulations in excess of 20,000, *Grosjean* v. *American Press Co., supra;* requiring a license for the distribution of printed matter, *Lovell* v. *Griffin,* 303 U. S. 444 (1938); and prohibiting the door-to-door distribution of leaflets, *Martin* v. *Struthers,* 319 U. S. 141 (1943).[8]

But no suggestion is made in this case that the Ordinance was passed with any purpose of muzzling or curbing the press. Nor does Pittsburgh Press argue that the Ordinance threatens its financial viability [9] or impairs in any significant way its ability to publish and distribute its newspaper. In any event, such a contention would not be supported by the record.

### III

In a limited way, however, the Ordinance as construed does affect the makeup of the help-wanted section of the newspaper. Under the modified order, Pittsburgh Press will be required to abandon its present policy of providing

---

[8] See also *Jones* v. *Opelika,* 319 U. S. 103 (1943); *Murdock* v. *Pennsylvania,* 319 U. S. 105 (1943).

[9] In response to questioning at oral argument, counsel for Pittsburgh Press stated only:

"Now, I'm not prepared to answer whether the company makes money on [want ads] or not. I suspect it does. They charge for want-ads, and they do make a lot of their revenue in the newspaper through advertising, of course; and I suspect it is profitable." Tr. of Oral Arg. 10.

sex-designated columns and allowing advertisers to select the columns in which their help-wanted advertisements will be placed. In addition, the order does not allow Pittsburgh Press to substitute a policy under which it would make an independent decision regarding placement in sex-designated columns.

Respondents rely principally on the argument that this regulation is permissible because the speech is commercial speech unprotected by the First Amendment. The commercial-speech doctrine is traceable to the brief opinion in *Valentine* v. *Chrestensen,* 316 U. S. 52 (1942), sustaining a city ordinance which had been interpreted to ban the distribution by handbill of an advertisement soliciting customers to pay admission to tour a submarine. Mr. Justice Roberts, speaking for a unanimous Court, said:

> "We are . . . clear that the Constitution imposes no such restraint on government as respects purely commercial advertising." *Id.,* at 54.

Subsequent cases have demonstrated, however, that speech is not rendered commercial by the mere fact that it relates to an advertisement. In *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), a city official of Montgomery, Alabama, brought a libel action against four clergymen and the New York Times. The names of the clergymen had appeared in an advertisement, carried in the Times, criticizing police action directed against members of the civil rights movement. In holding that this political advertisement was entitled to the same degree of protection as ordinary speech, the Court stated:

> "That the Times was paid for publishing the advertisement is as immaterial in this connection as

is the fact that newspapers and books are sold."
*Id.,* at 266.

See also *Smith* v. *California,* 361 U. S. 147 (1959); *Ginzburg* v. *United States,* 383 U. S. 463, 474 (1966). If a newspaper's profit motive were determinative, all aspects of its operations—from the selection of news stories to the choice of editorial position—would be subject to regulation if it could be established that they were conducted with a view toward increased sales. Such a basis for regulation clearly would be incompatible with the First Amendment.

The critical feature of the advertisement in *Valentine* v. *Chrestensen* was that, in the Court's view, it did no more than propose a commercial transaction, the sale of admission to a submarine. In *New York Times Co.* v. *Sullivan,* Mr. Justice Brennan, for the Court, found the *Chrestensen* advertisement easily distinguishable:

> "The publication here was not a 'commercial' advertisement in the sense in which the word was used in *Chrestensen.* It communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern." 376 U. S., at 266.

In the crucial respects, the advertisements in the present record resemble the *Chrestensen* rather than the *Sullivan* advertisement. None expresses a position on whether, as a matter of social policy, certain positions ought to be filled by members of one or the other sex, nor does any of them criticize the Ordinance or the Commission's enforcement practices. Each is no more than a proposal of possible employment. The advertisements are thus classic examples of commercial speech.

But Pittsburgh Press contends that *Chrestensen* is not applicable, as the focus in this case must be upon the exercise of editorial judgment by the newspaper as to where to place the advertisement rather than upon its commercial content. The Commission made a finding of fact that Pittsburgh Press defers in every case to the advertiser's wishes regarding the column in which a want ad should be placed. It is nonetheless true, however, that the newspaper does make a judgment whether or not to allow the advertiser to select the column. We must therefore consider whether this degree of judgmental discretion by the newspaper with respect to a purely commercial advertisement is distinguishable, for the purposes of First Amendment analysis, from the content of the advertisement itself. Or, to put the question differently, is the conduct of the newspaper with respect to the employment want ad entitled to a protection under the First Amendment which the Court held in *Chrestensen* was not available to a commercial advertiser?

Under some circumstances, at least, a newspaper's editorial judgments in connection with an advertisement take on the character of the advertisement and, in those cases, the scope of the newspaper's First Amendment protection may be affected by the content of the advertisement. In the context of a libelous advertisement, for example, this Court has held that the First Amendment does not shield a newspaper from punishment for libel when with actual malice it publishes a falsely defamatory advertisement. *New York Times Co.* v. *Sullivan, supra,* at 279–280. Assuming the requisite state of mind, then, nothing in a newspaper's editorial decision to accept an advertisement changes the character of the falsely defamatory statements. The newspaper may not defend a libel suit on the ground that the falsely defamatory statements are not its own.

Similarly, a commercial advertisement remains commercial in the hands of the media, at least under some circumstances.[10] In *Capital Broadcasting Co.* v. *Acting Attorney General,* 405 U. S. 1000 (1972), aff'g 333 F. Supp. 582 (DC 1971), this Court summarily affirmed a district court decision sustaining the constitutionality of 15 U. S. C. § 1335, which prohibits the electronic media from carrying cigarette advertisements. The District Court there found that the advertising should be treated as commercial speech, even though the First Amendment challenge was mounted by radio broadcasters rather than by advertisers. Because of the peculiar characteristics of the electronic media, *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 226–227 (1943), *Capital Broadcasting* is not dispositive here on the ultimate question of the constitutionality of the Ordinance. Its significance lies, rather, in its recognition that the exercise of this kind of editorial judgment does not necessarily strip commercial advertising of its commercial character.[11]

As for the present case, we are not persuaded that either the decision to accept a commercial advertisement which the advertiser directs to be placed in a sex-designated column or the actual placement there lifts the newspaper's actions from the category of commercial speech. By implication at least, an advertiser whose want ad appears in the "Jobs—Male Interest" column

---

[10] In *Head* v. *New Mexico Board,* 374 U. S. 424 (1963), this Court upheld an injunction prohibiting a newspaper and a radio station from carrying optometrists' advertisements which violated New Mexico law. But because the issue had not been raised in the lower courts, this Court did not consider the appellant's First Amendment challenge. *Id.,* at 432 n. 12.

[11] See also *New York State Broadcasters Assn.* v. *United States,* 414 F. 2d 990 (CA2 1969), cert. denied, 396 U. S. 1061 (1970) (refusing to strike down a ban on broadcasts promoting a lottery).

is likely to discriminate against women in his hiring decisions. Nothing in a sex-designated column heading sufficiently dissociates the designation from the want ads placed beneath it to make the placement severable for First Amendment purposes from the want ads themselves. The combination, which conveys essentially the same message as an overtly discriminatory want ad, is in practical effect an integrated commercial statement.

Pittsburgh Press goes on to argue that if this package of advertisement and placement is commercial speech, then commercial speech should be accorded a higher level of protection than *Chrestensen* and its progeny would suggest. Insisting that the exchange of information is as important in the commercial realm as in any other, the newspaper here would have us abrogate the distinction between commercial and other speech.

Whatever the merits of this contention may be in other contexts, it is unpersuasive in this case. Discrimination in employment is not only commercial activity, it is *illegal* commercial activity under the Ordinance.[12] We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes. Nor would the result be different if the nature of the transaction were indicated by placement under columns captioned "Narcotics for Sale" and "Prostitutes Wanted" rather than stated within the four corners of the advertisement.

The illegality in this case may be less overt, but we see no difference in principle here. Sex discrimination in nonexempt employment has been declared illegal under

---

[12] See Note, Freedom of Expression in a Commercial Context, 78 Harv. L. Rev. 1191, 1195–1196 (1965). Cf. *Capital Broadcasting Co.* v. *Mitchell*, 333 F. Supp. 582, 593 n. 42 (D. C. 1971) (Wright, J., dissenting); *Camp-of-the-Pines, Inc.* v. *New York Times Co.*, 184 Misc. 389, 53 N. Y. S. 2d 475 (1945).

§ 8 (a) of the Ordinance, a provision not challenged here. And § 8 (e) of the Ordinance forbids any employer, employment agency, or labor union to publish or cause to be published any advertisement "indicating" sex discrimination. This, too, is unchallenged. Moreover, the Commission specifically concluded that it is an unlawful employment practice for an advertiser to cause an employment advertisement to be published in a sex-designated column.

Section 8 (j) of the Ordinance, the only provision which Pittsburgh Press was found to have violated and the only provision under attack here, makes it unlawful for "any person . . . to aid . . . in the doing of any act declared to be an unlawful employment practice by this ordinance." The Commission and the courts below concluded that the practice of placing want ads for non-exempt employment in sex-designated columns did indeed "aid" employers to indicate illegal sex preferences. The advertisements, as embroidered by their placement, signaled that the advertisers were likely to show an illegal sex preference in their hiring decisions. Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity.

## IV

It is suggested, in the brief of an *amicus curiae*, that apart from other considerations, the Commission's order should be condemned as a prior restraint on expression.[13] As described by Blackstone, the protection against prior

---

[13] Brief for *Amicus Curiae* American Newspaper Publishers Association 22 n. 32.

restraint at common law barred only a system of administrative censorship:

> "To subject the press to the restrictive power of a licenser, as was formerly done, both before and since the revolution, . . . is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion, and government." 4 W. Blackstone, Commentaries *152.

While the Court boldly stepped beyond this narrow doctrine in *Near* v. *Minnesota,* 283 U. S. 697 (1931), in striking down an injunction against further publication of a newspaper found to be a public nuisance, it has never held that all injunctions are impermissible. See *Lorain Journal Co.* v. *United States,* 342 U. S. 143 (1951). The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment.

The present order does not endanger arguably protected speech. Because the order is based on a continuing course of repetitive conduct, this is not a case in which the Court is asked to speculate as to the effect of publication. Cf. *New York Times Co.* v. *United States,* 403 U. S. 713 (1971). Moreover, the order is clear and sweeps no more broadly than necessary. And because no interim relief was granted, the order will not have gone into effect before our final determination that the actions of Pittsburgh Press were unprotected.[14]

---

[14] The dissent of THE CHIEF JUSTICE argues that Pittsburgh Press is in danger of being "subject to summary punishment for contempt for having made an 'unlucky' legal guess." *Post,* at 396–397. The Commission is without power to punish summarily for contempt. When it concludes that its order has been violated, "the Commission

## V

We emphasize that nothing in our holding allows government at any level to forbid Pittsburgh Press to publish and distribute advertisements commenting on the Ordinance, the enforcement practices of the Commission, or the propriety of sex preferences in employment. Nor, *a fortiori*, does our decision authorize any restriction whatever, whether of content or layout, on stories or commentary originated by Pittsburgh Press, its columnists, or its contributors. On the contrary, we reaffirm unequivocally the protection afforded to editorial judgment and to the free expression of views on these and other issues, however controversial. We hold only that the Commission's modified order, narrowly drawn to prohibit placement in sex-designated columns of advertisements for nonexempt job opportunities, does not infringe the First Amendment rights of Pittsburgh Press.

*Affirmed.*

[For Appendix to opinion of the Court, see *post,* p. 392.]

---

shall certify the case and the entire record of its proceedings to the City Solicitor, who shall invoke the aid of an appropriate court to secure enforcement or compliance with the order or to impose [a fine of not more than $300] or both." § 14 of the Ordinance; Appendix to Pet. for Cert. 103a. But, more fundamentally, it was the newspaper's *policy* of allowing employers to place advertisements in sex-designated columns without regard to the exceptions or exemptions contained in the Ordinance, not its treatment of particular want ads, which was challenged in the complaint and was found by the Commission and the courts below to be violative of the Ordinance. Nothing in the modified order or the opinions below prohibits the newspaper from relying in good faith on the representation of an advertiser that a particular job falls within an exception to the Ordinance.

## APPENDIX TO OPINION OF THE COURT

Among the advertisements carried in the Sunday Pittsburgh Press on January 4, 1970, was the following one, submitted by an employment agency and placed in the "JOBS—MALE INTEREST" column:

| | |
|---|---|
| ACAD. INSTRUCTORS | $13,000 |
| ACCOUNTANTS | 10,000 |
| ADM. ASS'T, CPA | 15,000 |
| ADVERTISING MGR. | 10,000 |
| BOOKKEEPER F–C | 9,000 |
| FINANCIAL CONSULTANT | 12,000 |
| MARKETING MANAGER | 15,000 |
| MGMT. TRAINEE | 8,400 |
| OFFICE MGR. TRAINEE | 7,200 |
| LAND DEVELOPMENT | 30,000 |
| PRODUCT. MANAGER | 18,000 |
| PERSONNEL MANAGER | OPEN |
| SALES-ADVERTISING | 8,400 |
| SALES-CONSUMER | 9,600 |
| SALES-INDUSTRIAL | 12,000 |
| SALES-MACHINERY | 8,400 |
| RETAIL MGR. | 15,000 |

Most Positions Fee Paid
EMPLOYMENT SPECIALISTS
2248 Oliver Bldg.   261–2250
Employment Agency

App. 311a.

On the same day, the same agency's advertisement in the "JOBS—FEMALE INTEREST" column was as follows:

| | |
|---|---|
| ACAD. INSTRUCTORS | $13,000 |
| ACCOUNTANTS | 6,000 |
| AUTO-INS. UNDERWRITER | OPEN |
| BOOKKEEPER-INS | 5,000 |
| CLERK-TYPIST | 4,200 |
| DRAFTSMAN | 6,000 |
| KEYPUNCH D. T. | 6,720 |
| KEYPUNCH BEGINNER | 4,500 |
| PROOFREADER | 4,900 |
| RECEPTIONIST—Mature D. T. | OPEN |
| EXEC. SEC. | 6,300 |
| SECRETARY | 4,800 |
| SECRETARY, Equal Oppor. | 6,000 |
| SECRETARY D. T. | 5,400 |
| TEACHERS-Pt. Time | day 33. |
| TYPIST-Statistical | 5,000 |

Most Positions Fee Paid
EMPLOYMENT SPECIALISTS
2248 Oliver Bldg.   261–2250
Employment Agency

*Ibid.*

Characteristic of those offering fuller job descriptions was the following advertisement, carried in the "JOBS—MALE INTEREST" column:

**STAFF MANAGEMENT TRAINEE**
TO $12,000

If you have had background in the management of small business then this could be the stepping stone you have been waiting for. You will be your own boss with no cash outlay. Call or write today.

App. 313a.

MR. CHIEF JUSTICE BURGER, dissenting.

Despite the Court's efforts to decide only the narrow question presented in this case, the holding represents, for me, a disturbing enlargement of the "commercial speech" doctrine, *Valentine* v. *Chrestensen,* 316 U. S. 52 (1942), and a serious encroachment on the freedom of press guaranteed by the First Amendment. It also launches the courts on what I perceive to be a treacherous path of defining what layout and organizational decisions of newspapers are "sufficiently associated" with the "commercial" parts of the papers as to be constitutionally unprotected and therefore subject to governmental regulation. Assuming, *arguendo,* that the First Amendment permits the States to place restrictions on the content of commercial advertisements, I would not enlarge that power to reach the layout and organizational decisions of a newspaper.

Pittsburgh Press claims to have decided to use sex-designated column headings in the classified advertising section of its newspapers to facilitate the use of classified ads by its readers. Not only is this purpose conveyed to the readers in plain terms, but the newspaper also explicitly cautions readers against interpreting the column headings as indicative of sex discrimination. Thus,

before each column heading the newspaper prints the following "Notice to Job Seekers":

"Jobs are arranged under Male and Female classifications for the convenience of our readers. This is done because most jobs generally appeal more to persons of one sex than the other. Various laws and ordinances—local, state and federal, prohibit discrimination in employment because of sex unless sex is a bona fide occupational requirement. Unless the advertisement itself specifies one sex or the other, job seekers should assume that the advertiser will consider applicants of either sex in compliance with the laws against discrimination."

To my way of thinking, Pittsburgh Press has clearly acted within its protected journalistic discretion in adopting this arrangement of its classified advertisements. Especially in light of the newspaper's "Notice to Job Seekers," it is unrealistic for the Court to say, as it does, that the sex-designated column headings are not "sufficiently dissociate[d]" from the "want ads placed beneath [them] to make the placement severable for First Amendment purposes from the want ads themselves."[1] *Ante,* at 388. In any event, I believe the First Amendment

---

[1] The Court and the opinions under review place great stress on the finding of the Pittsburgh Commission on Human Relations that the Pittsburgh Press "permits the advertiser to select the column within which its advertisement is to be inserted." That finding, however, does not disprove Pittsburgh Press' claim that it uses column headings for the convenience of its readers. In any event, the order under review, as the Court acknowledges, "does not allow Pittsburgh Press to substitute a policy under which it would make an independent decision regarding placement in sex-designated columns." *Ante,* at 384. Thus, even if the newspaper became actively involved in selecting the appropriate column for each advertisement, presumably the Commission's order would still prohibit Pittsburgh Press from using the column headings.

freedom of press includes the right of a newspaper to arrange the content of its paper, whether it be news items, editorials, or advertising, as it sees fit.[2] In the final analysis, the readers are the ultimate "controllers" no matter what excesses are indulged in by even a flamboyant or venal press; that it often takes a long time for these influences to bear fruit is inherent in our system.

The Court's conclusion that the Commission's cease-and-desist order does not constitute a prior restraint gives me little reassurance. That conclusion is assertedly based on the view that the order affects only a "continuing course of repetitive conduct." *Ante,* at 390. Even if that were correct, I would still disagree since the Commission's order appears to be in effect an outstanding *injunction* against certain publications—the essence of a prior restraint. In any event, my understanding of the effects of the Commission's order differs from that of the Court. As noted in the Court's opinion, the Commonwealth Court narrowed the injunction to permit Pittsburgh Press to use sex-designated column headings for want ads dealing with jobs exempt under the Ordinance. The Ordinance does not apply, for example,

> "to employers of fewer than five persons, to employers outside the city of Pittsburgh, or to religious, fraternal, charitable or sectarian organizations, nor does it apply to employment in domestic service or in jobs for which the Commission has certified a bona fide occupational exception." *Ante,* at 380.

---

[2] There would be time enough to consider whether this principle would apply to the situation hypothesized by the Court, for example, where a newspaper gives "notice" of narcotics transactions by placing certain advertisements under a "Narcotics for Sale" caption. For now, I need only state that the two situations strike me as being entirely different. We do not have here, in short, such a blatant involvement by a newspaper in a criminal transaction.

If Pittsburgh Press chooses to continue using its column headings for advertisements submitted for publication by exempted employers, it may well face difficult legal questions in deciding whether a particular employer is or is not subject to the Ordinance. If it makes the wrong decision and includes a covered advertisement under a sex-designated column heading, it runs the risk of being held in summary contempt for violating the terms of the order.[3]

In practical effect, therefore, the Commission's order in this area may have the same inhibiting effect as the injunction in *Near* v. *Minnesota,* 283 U. S. 697 (1931), which permanently enjoined the publishers of a newspaper from printing a "malicious, scandalous or defamatory newspaper, as defined by law." *Id.,* at 706. We struck down the injunction in *Near* as a prior restraint. In 1971, we reaffirmed the principle of presumptive unconstitutionality of prior restraint in *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415 (1971). Indeed, in *New York Times Co.* v. *United States,* 403 U. S. 713 (1971), every member of the Court, tacitly or explicitly, accepted the *Near* and *Keefe* condemnation of prior restraint as presumptively unconstitutional. In this case, the respondents have, in my view, failed to carry their burden. I would therefore hold the Commission's order to be impermissible prior restraint. At the very least, we ought to make clear that a newspaper may not be subject to summary punishment for contempt for having made an

---

[3] The Court's statement that the "Commission is without power to punish summarily for contempt," *ante,* at 390 n. 14, is hardly reassuring to me in a First Amendment setting. We are still left with no assurance that an enforcement action initiated at the request of the Commission will not be summary in nature. It is helpful that the Court expresses a caveat on this score. However, the weighty presumption of unconstitutionality of prior restraint of the press seems to be given less regard than we have traditionally accorded it.

"unlucky" legal guess on a particular advertisement or for having failed to secure advance Commission approval of a decision to run an advertisement under a sex-designated column.

MR. JUSTICE DOUGLAS, dissenting.

While I join the dissent of MR. JUSTICE STEWART, I add a few words. As he says, the press, like any other business, can be regulated on business and economic matters. Our leading case on that score is *Associated Press* v. *United States*, 326 U. S. 1, which holds that a news-gathering agency may be made accountable for violations of the antitrust laws. By like token, a news-paper, periodical, or TV or radio broadcaster may be subjected to labor relations laws. And that regulation could constitutionally extend to the imposition of penalties or other sanctions if any unit of the press violated laws that barred discrimination in employment based on race or religion or sex.

Pennsylvania has a regulatory regime designed to eliminate discrimination in employment based on sex; and the commission in charge of that program issues cease-and-desist orders against violators. There is no doubt that Pittsburgh Press would have no constitutional defense against such a cease-and-desist order issued against it for discriminatory employment practices.

But I believe that Pittsburgh Press by reason of the First Amendment may publish what it pleases about any law without censorship or restraint by Government. The First Amendment does not require the press to reflect any ideological or political creed reflecting the dominant philosophy, whether transient or fixed. It may use its pages and facilities to denounce a law and urge its repeal or, at the other extreme, denounce those who do not respect its letter and spirit.

Commercial matter, as distinguished from news, was

held in *Valentine* v. *Chrestensen*, 316 U. S. 52, not to be subject to First Amendment protection. My views on that issue have changed since 1942, the year *Valentine* was decided. As I have stated on earlier occasions, I believe that commercial materials also have First Amendment protection. If Empire Industries Ltd., doing business in Pennsylvania, wanted to run full-page advertisements denouncing or criticizing this Pennsylvania law, I see no way in which Pittsburgh Press could be censored or punished for running the ad, any more than a person could be punished for uttering the contents of the ad in a public address in Independence Hall. The *pros* and *cons* of legislative enactments are clearly discussion or dialogue that is highly honored in our First Amendment traditions.

The want ads which gave rise to the present litigation express the preference of one employer for the kind of help he needs. If he carried through to hiring and firing employees on the basis of those preferences, the state commission might issue a remedial order against him, if discrimination in employment was shown. Yet he could denounce that action with impunity and Pittsburgh Press could publish his denunciation or write an editorial taking his side also with impunity.

Where there is a valid law, the Government can enforce it. But there can be no valid law censoring the press or punishing it for publishing its views or the views of subscribers or customers who express their ideas in letters to the editor or in want ads or other commercial space. There comes a time, of course, when speech and action are so closely brigaded that they are really one. Falsely shouting "fire" in a theater, the example given by Mr. Justice Holmes, *Schenck* v. *United States*, 249 U. S. 47, 52, is one example. *Giboney* v. *Empire Storage Co.*, 336 U. S. 490, written by Mr. Justice Black, is another. There are here, however, no such unusual circumstances.

As Mr. Justice Stewart says, we have witnessed a growing tendency to cut down the literal requirements of First Amendment freedoms so that those in power can squelch someone out of step. Historically, the miscreant has usually been an unpopular minority. Today it is a newspaper that does not bow to the spreading bureaucracy that promises to engulf us. It may be that we have become so stereotyped as to have earned that fate. But the First Amendment presupposes free-wheeling, independent people whose vagaries include ideas spread across the entire spectrum of thoughts and beliefs.* I would let any expression in that broad spectrum flourish, unrestrained by Government, unless it was an integral part of action—the only point which in the Jeffersonian philosophy marks the permissible point of governmental intrusion.

I therefore dissent from affirmance of this judgment.

---

*As Alexander Meiklejohn has stated: "The First Amendment was not written primarily for the protection of those intellectual aristocrats who pursue knowledge solely for the fun of the game, whose search for truth expresses nothing more than a private intellectual curiosity or an equally private delight and pride in mental achievement. It was written to clear the way for thinking which serves the general welfare. It offers defense to men who plan and advocate and incite toward corporate action for the common good. On behalf of such men it tells us that every plan of action must have a hearing, every relevant idea of fact or value must have full consideration, whatever may be the dangers which that activity involves. It makes no difference whether a man is advocating conscription or opposing it, speaking in favor of a war or against it, defending democracy or attacking it, planning a communist reconstruction of our economy or criticising it. So long as his active words are those of participation in public discussion and public decision of matters of public policy, the freedom of those words may not be abridged. That freedom is the basic postulate of a society which is governed by the votes of its citizens." Free Speech and Its Relation to Self-Government 45–46 (1948).

MR. JUSTICE STEWART, with whom MR. JUSTICE DOUG-LAS joins, dissenting.

I have no doubt that it is within the police power of the city of Pittsburgh to prohibit discrimination in private employment on the basis of race, color, religion, ancestry, national origin, place of birth, or sex. I do not doubt, either, that in enforcing such a policy the city may prohibit employers from indicating any such discrimination when they make known the availability of employment opportunities. But neither of those propositions resolves the question before us in this case.

That question, to put it simply, is whether any government agency—local, state, or federal—can tell a newspaper in advance what it can print and what it cannot. Under the First and Fourteenth Amendments I think no government agency in this Nation has any such power.[1]

It is true, of course, as the Court points out, that the publisher of a newspaper is amenable to civil and criminal laws of general applicability. For example, a newspaper publisher is subject to nondiscriminatory general taxation,[2] and to restrictions imposed by the National Labor Relations Act,[3] the Fair Labor Standards Act,[4] and the Sherman Act.[5] In short, as businessman or em-

---

[1] I put to one side the question of governmental power to prevent publication of information that would clearly imperil the military defense of our Nation, e. g., "the publication of the sailing dates of transports or the number and location of troops." *Near* v. *Minnesota*, 283 U. S. 697, 716.

[2] See *Grosjean* v. *American Press Co.*, 297 U. S. 233, 250; *Murdock* v. *Pennsylvania*, 319 U. S. 105, 112.

[3] See *Associated Press* v. *NLRB*, 301 U. S. 103, 132–133.

[4] See *Oklahoma Press Publishing Co.* v. *Walling*, 327 U. S. 186, 192–193; *Mabee* v. *White Plains Publishing Co.*, 327 U. S. 178.

[5] See *Associated Press* v. *United States*, 326 U. S. 1; *Lorain Journal Co.* v. *United States*, 342 U. S. 143, 155–157; *Citizen Publishing Co.* v. *United States*, 394 U. S. 131, 139.

ployer, a newspaper publisher is not exempt from laws affecting businessmen and employers generally. Accordingly, I assume that the Pittsburgh Press Co., as an employer, can be and is completely within the coverage of the Human Relations Ordinance of the city of Pittsburgh.

But what the Court approves today is wholly different. It approves a government order dictating to a publisher in advance how he must arrange the layout of pages in his newspaper.

Nothing in *Valentine* v. *Chrestensen,* 316 U. S. 52, remotely supports the Court's decision. That case involved the validity of a local sanitary ordinance that prohibited the distribution in the streets of "commercial and business advertising matter." The Court held that the ordinance could be applied to the owner of a commercial tourist attraction who wanted to drum up trade by passing out handbills in the streets. The Court said it was "clear that the Constitution imposes no such restraint on government as respects purely commercial advertising. Whether, and to what extent, one may promote or pursue a gainful occupation in the streets, to what extent such activity shall be adjudged a derogation of the public right of user, are matters for legislative judgment." *Id.,* at 54. Whatever validity the *Chrestensen* case may still retain when limited to its own facts,[6] it certainly does not stand for the proposition that the advertising pages of a newspaper are outside the protection given the newspaper by the First and Fourteenth Amendments. Any possible doubt on that score was surely laid to rest in *New York Times Co.* v. *Sullivan,* 376 U. S. 254.[7]

---

[6] MR. JUSTICE DOUGLAS has said that "[t]he [*Chrestensen*] ruling was casual, almost offhand. And it has not survived reflection." *Cammarano* v. *United States,* 358 U. S. 498, 514 (concurring opinion).

[7] The Court acknowledges, as it must, that what it approves today

So far as I know, this is the first case in this or any other American court that permits a government agency to enter a composing room of a newspaper and dictate to the publisher the layout and makeup of the newspaper's pages. This is the first such case, but I fear it may not be the last. The camel's nose is in the tent. "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way. . . ." *Boyd* v. *United States,* 116 U. S. 616, 635.

So long as Members of this Court view the First Amendment as no more than a set of "values" to be balanced against other "values," that Amendment will remain in grave jeopardy. See *Paris Adult Theatre I* v. *Slaton, ante,* p. 49 (First and Fourteenth Amendment protections outweighed by public interest in "quality of life," "total community environment," "tone of commerce," "public safety"); *Branzburg* v. *Hayes,* 408 U. S. 665 (First Amendment claim asserted by newsman to maintain confidential relationship with his sources outweighed by obligation to give information to grand jury); *New York Times Co.* v. *United States,* 403 U. S. 713, 748 (BURGER, C. J., dissenting) (First Amendment outweighed by judicial problems caused by "unseemly haste"); *Columbia*

---

is not a restriction on a purely commercial advertisement but on the editorial judgment of the newspaper, for "the newspaper does make a judgment whether or not to allow the advertiser to select the column." *Ante,* at 386. The effect of the local ordinance and the court order is to affect the makeup of the help-wanted section of the newspaper, and to preclude Pittsburgh Press from placing advertisements in sex-designated columns. The Court justifies this restriction on the newspaper's editorial judgment by arguing that it had taken on the "character of the advertisement" so that the combination conveyed "an integrated commercial statement." But the stark fact remains that the restriction here was placed on the editorial judgment of the newspaper, not the advertisement.

*Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 199 (BRENNAN, J., dissenting) (balancing of "the competing First Amendment interests").

It is said that the goal of the Pittsburgh ordinance is a laudable one, and so indeed it is. But, in the words of Mr. Justice Brandeis, "Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead* v. *United States,* 277 U. S. 438, 479 (dissenting opinion). And, as Mr. Justice Black once pointed out, "The motives behind the state law may have been to do good. But . . . [h]istory indicates that urges to do good have led to the burning of books and even to the burning of 'witches.'" *Beauharnais* v. *Illinois,* 343 U. S. 250, 274 (dissenting opinion).

The Court today holds that a government agency can force a newspaper publisher to print his classified advertising pages in a certain way in order to carry out governmental policy. After this decision, I see no reason why government cannot force a newspaper publisher to conform in the same way in order to achieve other goals thought socially desirable. And if government can dictate the layout of a newspaper's classified advertising pages today, what is there to prevent it from dictating the layout of the news pages tomorrow?

Those who think the First Amendment can and should be subordinated to other socially desirable interests will hail today's decision. But I find it frightening. For I believe the constitutional guarantee of a free press is more than precatory. I believe it is a clear command

that government must never be allowed to lay its heavy editorial hand on any newspaper in this country.

MR. JUSTICE BLACKMUN, dissenting.

I dissent substantially for the reasons stated by MR. JUSTICE STEWART in his opinion. But I do not subscribe to the statements contained in that paragraph of his opinion which begins on p. 402 and ends on p. 403.