330 So.2d 301 (1976)
ECONOMY CARPETS MANUFACTURERS AND DISTRIBUTORS, INC.
v.
BETTER BUSINESS BUREAU OF BATON ROUGE AREA, INC.
No. 57146.
Supreme Court of Louisiana.
March 29, 1976.
*302 Bart Eaton, D. Bert Garraway, Baton Rouge, for plaintiff-relator.
Donald T. W. Phelps, Seale, Smith & Phelps, Baton Rouge, for defendant-respondent.
Calvin E. Hardin, Jr., Ashton L. Stewart, A. Leon Hebert, P. Raymond Lamonica, Baton Rouge, for amicus curiae.
DENNIS, Justice.
We granted certiorari to consider the ambit of constitutional protection to be afforded a person when the publication of his views out of court is alleged to be in conflict with the fair administration of justice in the courts. The petitioner, a litigant in a civil jury case before the East Baton Rouge Parish district court, contends that the trial judge, in prohibiting it from expressing opinions concerning the parties, the judge and other persons involved in the lawsuit, has abridged its liberty of free speech as protected by the *303 First Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and Article I, § 7 of the Louisiana Constitution of 1974.
On May 9, 1975, Economy Carpets Manufacturers and Distributors, Inc. instituted suit against the Better Business Bureau of Baton Rouge Area, Inc., claiming treble damages and attorney's fees for conspiratorial acts in restraint of trade and commerce under La.R.S. 51:122. Subsequently, plaintiff successfully moved the district court for an order allowing a trial by jury in these proceedings. During a hearing on a contested discovery motion the trial judge was orally informed by counsel that the parties had published comments about the litigation on a sign board and in a bulletin mailed within the Baton Rouge area. Without an evidentiary hearing, the court issued an order prohibiting the parties from using any public advertisements, news media, private publication or other means whatsoever to draw attention to the litigation, and further ordered that all signs were to be removed within twenty-four hours. On certiorari to this Court, the order of the trial court was set aside as having been improperly issued without affording the parties a hearing or an opportunity to present evidence. 319 So.2d 783 (La.1975).
After remand, the trial court conducted an evidentiary hearing on its own motion and issued an order commanding the plaintiff to cease and desist from using signs or any public advertisements to call attention to this litigation and prohibiting defendant from calling attention to this litigation by means of any public advertisements or private publications. We again granted writs to review the significant constitutional issues raised by this decision.
The facts are not in dispute. On May 6, 1975, Jesse James Jarreau, executive officer of Economy Carpets, stationed a portable electric sign at its place of business on Greenwell Springs Road in Baton Rouge, which read:

"CHARLIE TAPP OF CONSUMER PROTECTION IS A LIAR WHO SUCKS UP WITH THE B.B.B."
On May 15, 1975, the defendant BBB distributed to its membership a bulletin in which it discussed the background of this litigation. This included referral of complaints against Economy Carpets by the BBB to Mr. Charles Tapp, Director of the Governor's Office of Consumer Protection; an investigation of Economy by Mr. Tapp which resulted from the complaints; and various verbal attacks upon the BBB and Mr. Tapp made by Jesse James Jareau of Economy Carpets.
On May 29 or 30, 1975, Mr. Jarreau placed a portable electric sign across the street from the BBB office at 200 Laurel Street in Baton Rouge, which stated:

"THE BETTER BUSINESS BUREAU SHAFTS YOU & THE SMALL BUSINESSMAN TOO!"
On June 9, 1975, Mr. Jarreau changed the wording of the sign across from the BBB office to read:

"DALE RAMIREZ OF THE BETTER BUSINESS BUREAU MUST RESIGN PENDING INVESTIGATION."
Between June 17 and June 30, 1975, Mr. Jarreau was quoted in a local weekly newspaper as having said:
"We have asked for a jury trial, so I am not scared of Melvin Shortess. We might even put up a sign about him."
*304 On June 25, 1975, Mr. Jarreau changed the lettering on the sign across from the BBB office to state:

"BILLY GUSTE DOESN'T HAVE THE BALLS TO INVESTIGATE HIS DARLINGS, CHARLIE TAPP & THE BBB."
However, on June 27, 1975, he changed the word "balls" to "guts." Then on or about July 16, 1975, this sign was changed by Mr. Jarreau to say that congressional records prove that BBBs are phonies run by big shots, or words to that effect. On November 17 through 22, 1975, the sign erected across from the BBB office stated:

"THE BBB IS THE WORST BUNKO OPERATION OF THEM ALL ECONOMY CARPETS JESSE JAREAU."
From November 22, 1975 through January 9, 1976, it said:

"A VOTE FOR JUDGE SHORTESS IS A VOTE AGAINST FREEDOM OF SPEECH ECONOMY CARPETS JESSE JARREAU."[1]
At one point the sign was worded to read:

"NEWS FLASH JIM KOLTER QUITS BBB RUNNING SCARED MOVING OUT OF TOWN."
Mr. Jarreau testified that he thought he had a right to erect the signs and that he contemplated putting up similar ones in the future.
The evidence does not show the proximity of the signs to the parish courthouse, nor is there any indication that either sign could be seen by persons entering or leaving the court building.
In its written reasons for judgment the trial court concluded that:
"* * * It is imperative that strong protective measures be taken in order to assure that the trier of fact will not be influenced by anything other than an objective presentation of the evidence. * * *"
and cited as authority for its issuance of the protective order La.C.C.P. art. 1631 which, in pertinent part, provides:
"The court has the power to require that the proceeding shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done."
This article is a partial restatement of the courts' inherent judicial authority and power of supervision. La.Constitution of 1974, Art. II; Art. V, §§ 1, 2; La.C.C.P. art. 1631, Official Revision Comment (a). Unquestionably, this power and authority would furnish ground for the issuance of a protective order to assure the fair administration of justice under proper circumstances. See Economy Carpets v. BBB, 319 So.2d 783 (La.1975). However, the judicial authority, as all powers of government, is not without limit, and where it is asserted an individual's right of free speech has been abridged by the exercise of that power, the burden is upon us to define its limitations.
*305 Since any order issued under La.C.C.P. art. 1631 restricting an individual's freedom of expression would depend ultimately for its enforcement upon the court's contempt power, we find that the decisions of the United States Supreme Court defining the limitations upon that power to be controlling, insofar as petitioner's assertion of its First Amendment rights under the United States Constitution, and very pertinent to our inquiry into a court's authority to hinder freedom of expression under the Louisiana Constitution. In Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), the United States Supreme Court, in reviewing the principles evolved from the exercise of this judicial power in the context of the First Amendment protections, stated:
"We start with the premise that the right of courts to conduct their business in an untrammeled way lies at the foundation of our system of government and that courts necessarily must possess the means of punishing for contempt when conduct tends directly to prevent the discharge of their functions. While courts have continuously had the authority and power to maintain order in their courtrooms and to assure litigants a fair trial, the exercise of that bare contempt power is not what is questioned in this case. Here it is asserted that the exercise of the contempt power, to commit a person to jail for an utterance out of the presence of the court, has abridged the accused's liberty of free expression. In this situation the burden upon this Court is to define the limitations upon the contempt power according to the terms of the Federal Constitution.
"In Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192, [159 A.L.R. 1346], this Court for the first time had occasion to review a State's exercise of the contempt power utilized to punish the publisher of an out-of-court statement. The accused contended that the exercise abridged his right of free speech guaranteed against state infringement by the Fourteenth Amendment. To determine the scope of this constitutional protection, the Court reviewed the history of the contempt power, both in England and in this country. It held that `the only conclusion supported by [that] history is that the unqualified prohibitions laid down by the framers were intended to give to liberty of the press, as to the other liberties, the broadest scope that could be countenanced in an orderly society.' Id. [314 U.S.] at 265, 62 S.Ct.[190] at 194, 195. Thus clarifying the exercise of this judicial power in the context of the protections assured by the First Amendment, the Court held that out-of-court publications were to be governed by the clear and present danger standard, described as `a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished.' Id. [314 U.S.] at 263, 62 S.Ct. [190] at 194. Subsequently, in Pennekamp v. Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295, after noting that `[f]ree discussion of the problems of society is a cardinal principle of Americanisma principle which all are zealous to preserve' (id., [328 U.S.] at 346, 66 S.Ct. [1029] at 1037), the Court reaffirmed its belief that the `essential right of the courts to be free of intimidation and coercion . . . [is] consonant with a recognition that freedom of the press must be allowed in the broadest scope compatible with the supremacy of order.' Id. [328 U.S.] at 334, 66 S.Ct. [1029] at 1031. The Court's last occasion to consider the application of the clear and present danger principle to a case of the type under review was in Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546. There the Court held that to warrant a sanction `[t]he fires which [the expression] kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote *306 or even probable; it must immediately imperil.' Id. [331 U.S.] at 376, 67 S.Ct.[1249] at 1255." (Footnotes omitted.) 370 U.S. at 383, 82 S.Ct. at 1369, 8 L.Ed.2d at 576, 577.
Defendants contend that there is a significant distinction between these authorities and the instant case because the former do not involve a jury trial with its correlative considerations. We agree that the potential effect upon jurors is a valid factor in determining whether there is a clear and present danger that the fair administration of justice will be obstructed by the exercise of free speech in a particular situation. However, even in a jury case, a clear showing must be made that the exercise of free speech rights will interfere with the rights of the parties to a fair trial in order to justify prior restraint upon the freedom of expression. See Chase v. Robson, 435 F.2d 1059 (7th Cir. 1970); In re Oliver, 452 F.2d 111 (7th Cir. 1971); Recommendations of Committee on Operation of the Jury System of the Judicial Conference of the United States, 45 F.R.D. 391, 404-407 (1969).
Defendant further argues that the constitutional guarantees of free speech and press are inapplicable to "public advertisements" such as those proscribed by the trial court's order. However, the publications here were not commercial advertisements doing no more than proposing a business transaction. Instead, they "communicated information, expressed opinion, recited grievances, [and] protested claimed abuses." New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Compare the New York Times case and Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) with Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942). Furthermore, the United States Supreme Court cases have clearly established that speech is not stripped of First Amendment protection merely because it appears in the form of commercial advertising. Bigelow v. Virginia, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975).
We recognize the principles set forth in Wood v. Georgia, supra, as the proper criteria for determining both the federal and the Louisiana constitutional questions raised herein by plaintiff. Accordingly, we are required to examine the statements of the parties to see whether or not they carry a threat of clear and present danger to the orderly and fair administration of justice in our courts or whether they are of the character which the principles of the First and Fourteenth Amendments to the United States Constitution and Article I, § 7 of the Louisiana Constitution of 1974 protect.
Although the trial judge concluded the parties' statements created a serious evil he did not in any manner indicate how the publications threatened interference with the administration of justice. In contrast with the cases holding that suppression was appropriate, see, e. g. Toledo Newspaper Co. v. United States, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186 (1917), the record here does not contain elaborate factual findings.
Our review of the evidence reveals no danger of any kind to the administration of justice, much less a situation in which a substantial threat of evil is "extremely serious and the degree of imminence extremely high." Bridges v. California, supra, 314 U.S. at 263, 62 S.Ct. at 194. None of the utterances here even recommends how the litigation should be decided or constitutes a threat of consequences that will follow a contrary decision by the trier of facts. Compare Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941) and Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1946), wherein publications obviously designed to influence judicial decisions nevertheless were held entitled to protection as free speech because the expressions did not pose a *307 clear and present danger of accomplishing their purpose. In the present litigation, except for the sign referring to the judge, who is not the trier of facts in this civil jury case, it would be difficult for the uninitiated to determine that plaintiff's signs had any relation to a court proceeding. Even if we assume the utterances tended to coerce prospective jurors exposed to them, the statements could not have had a great impact within the thickly populated parish of East Baton Rouge. The publications were limited to two small sign boards and one mailing of an organizational bulletin, and the dispute did not receive any attention from television stations, daily newspapers, or other media. Without probative evidence that the publicity threatened to affect the answers of jurors on voir dire examination or testimony of witnesses at the trial, or to in some way create prejudice in the public mind or undue influence for a party so that a fair and impartial trial could not be obtained in the parish, we think it unreasonable to conclude that such would be the case. See La. C.C.P. art. 122 and La.C.Cr.P. art. 622, which describe these as circumstances that could prevent a fair and impartial trial.
The words of Mr. Justice Holmes, spoken in reference to very different facts, seem entirely applicable here:
"* * * I confess that I cannot find in all this or in the evidence in the case anything that would have affected a mind of reasonable fortitude, and still less can I find there anything that obstructed the administration of justice in any sense that I possibly can give to those words." Toledo Newspaper Co. v. United States, 247 U.S. at 425, 38 S.Ct. at 566, 62 L.Ed. at 1195.
Our examination of the statements and the circumstances under which they were published leads us to conclude that they did not present a danger to the administration of justice that should vitiate either party's freedom to express its opinion in the manner chosen.
The protective order of the trial court of November 17, 1975 is annulled and set aside, and the case is remanded to the trial court for further proceedings.
SUMMERS, J., concurs.
DIXON, J., concurs with reasons.
DIXON, Justice (concurring).
Although I fully subscribe to the majority opinion, I would note that it must not be considered authority for attorneys to resort to extra-judicial publicity for pending litigation. Canon 7, Ethical Consideration 7-33, Code of Professional Responsibility.
NOTES
[1] This sign was erected after the issuance of the cease and desist order by the trial judge. However, the parties stipulated that this fact be made a part of the record for consideration by us in deciding the case.