**SAMBO'S RESTAURANTS, INC., and Sambar Properties, Inc., Plaintiffs-Appellants,**

v.

**The CITY OF ANN ARBOR; George W. Gardner and G. M. Scofield, Defendants-Appellees.**

No. 79–1338.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 11, 1980.

Decided Nov. 4, 1981.

Stephen E. Dawson, James A. Samborn, Dickinson, Wright, McKean, Cudlip & Moon, Detroit, Mich., for plaintiffs-appellants.

R. Bruce Laidlaw, City Atty., Ann Arbor, Mich., for defendants-appellees.

Before KEITH and MERRITT, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

This case raises novel freedom of speech issues regarding the standard for the waiver of first amendment rights and the scope of first amendment protection to be afforded "offensive" commercial speech. In 1971, Sambo's Restaurants, Inc., petitioned the City of Ann Arbor, Michigan, for site plan approval for construction of a Sambo's Restaurant. When the City Council balked at accepting the proposal, Sambo's agreed not to use that name in connection with the restaurant. Approval by the City Council followed quickly. After six years of operation under the name "Jolly Tiger", the restaurant applied to the City for sign permits to display the name "Sambo's". Those permits were granted, the signs erected, but the permits were subsequently revoked by the City as in contravention of the earlier "agreement". When Sambo's refused to remove the signs, the City threatened legal action. Sambo's then filed this diversity action seeking declaratory and injunctive relief for violations of its constitutional rights, 42 U.S.C. Sec. 1983. The district court's rulings that the company's stipulation not to use the name "Sambo's" was a valid and binding agreement, and that Sambo's had waived whatever First Amendment rights it might possess, form the basis of this appeal.

## I.

In order to expedite the trial on the merits, the parties provided the district court with stipulated facts which are as follows. The original Sambo's Restaurant was opened in 1957 by Sam Battistone and F. Newell Bohnett. At that time, Sam Battistone's son suggested the name "Sambo's" as an appropriate title for a pancake house restaurant concept. The name was suggested because it conjured up associations with pancakes and, coincidentally, combined the names of the founders.[1]

In the twenty-four years since its incorporation, Sambo's Restaurants has invested substantial sums and efforts in developing the name "Sambo's". Substantial goodwill is attributed to that name, and it constitutes a valuable property interest which is used in interstate commerce to provide a central marketing theme for all the restaurants and to convey to the public the image of a restaurant offering uniformly good food, good service and high quality at reasonable prices. The name "Sambo's" is also registered with the United States Patent and Trademark Office under 15 U.S.C. Sec. 1051.

The identity of the products and services of Sambo's Restaurants is promoted by substantial advertising. Since 1971, Sambo's has spent over $31 million in national advertising to familiarize the public with its product. In December, 1971, in accordance with the Ann Arbor City Ordinance Code, Sambo's Restaurants acting through its wholly owned subsidiary, Restaurant Properties, Inc., filed an application with Ann Arbor for site plan approval for the construction of a Sambo's Restaurant within the city limits. In Ann Arbor, approval by the City Council is a condition precedent to construction of a restaurant. In accordance with the Ordinance Code, a site plan is first submitted to the Planning Commission for a recommendation. Although the Code provides that the Planning Commission shall make its recommendation to City Council within 60 days after the filing of a site plan proposal, and that the City Council shall take final action within 30 days of the Commission's recommendation, subject to extensions of 30 day periods if necessary for adequate review, the Sambo's site plan was not presented to City Council until November 13, 1972. The plan offered by Sambo's complied with all applicable city ordinances and regulations when it was submitted.

1. The pancake image derives from *The Story of Little Black Sambo* written in 1899 by Helen Bannerman. A childhood narrative, it is the tale of a small boy, Little Black Sambo, who loses his red coat, blue trousers, purple shoes and green umbrella to marauding tigers. In fighting among themselves, the tigers chase each other in a ring around a tree, running so fast that they melt away leaving nothing but a big pool of butter. Little Black Sambo and his parents then use that butter in preparing a delicious pancake supper.

While the parties agreed that the name Sambo's was not and is not intended to be insulting, degrading or offensive, they also stipulated that the word "Sambo" is offensive to some black people if directed at them, and that the use of the name "Sambo's" in connection with the restaurant is offensive to some people, but that others, including blacks, are not so offended.

During the fall of 1972, Sambo's learned that some members of the City Council and the Mayor objected to the use of the name "Sambo's" in connection with the restaurant because of its offensive connotations.[2] The plan was submitted to the City Council for approval, together with the proposal for a Ponderosa Steakhouse, at a meeting on November 13, 1972. At that time the Mayor recommended approval for both site plans because the City Council had no legal basis for denying the plans. During the course of that meeting, however, one member of the City Council, Norris Thomas, stated that he could not support the proposal on the basis of the name alone, and that he would personally lead an economic boycott of the restaurant if it were erected under the name "Sambo's." The Mayor echoed support for these comments as did other council members. Although the Ponderosa site plan was approved at that meeting, the Sambo's Restaurant site plan and shopping center plan were tabled. Based upon the statements made by the Mayor and other City Council members at the November 13 and other public meetings, the attorneys for Restaurant Properties believed that the site plan would not be approved by City Council unless the name "Sambo's" was not used in connection with the restaurant. This understanding was in turn conveyed to Sambo's. As a direct result of this apprehension, Sambo's decided to concede the name issue. On November 21, 1972, Restaurant Properties stated on the site plan proposal that: "It is agreed that the name "Sambo's" will not be used in regard to this restaurant." Restaurant Properties would not have made this state-

ment but for its belief that the site plan would be rejected under the name "Sambo's." At the December 4, 1972 meeting of Council—almost one year after submission of the application—the restaurant site plan was approved by a seven to four vote. Following approval, Sambo's Restaurants constructed the restaurant and operated it under the name "Jolly Tiger."

The operation of the restaurant under the name "Jolly Tiger" proved unprofitable, and in 1978 it lost more than $18,000.00. That experience was not isolated; in 1978, Sambo's operated 14 Jolly Tiger Restaurants which averaged a net loss of $11,687.00 per restaurant. As a result of the financial losses, on December 6, 1978, Sambo's Restaurants instructed Michigan Signs, Inc., to make an application on its behalf to the Ann Arbor Building Department for sign permits for two building signs displaying the name "Sambo's" to be erected on the restaurant. On December 19, 1978, sign permits were issued by the City of Ann Arbor, and on December 28, 1978, the two "Sambo's" signs authorized by those permits were erected. On January 2, 1979, the City of Ann Arbor revoked the sign permits on the grounds that the use of the name "Sambo's" violated the 1972 "agreement" with the City.

Following revocation of the sign permits, the City threatened to cite Sambo's for violation of the city sign ordinance and to take whatever further steps were necessary to force Sambo's to remove the signs. The institution of or continuation of threatened criminal or other sanctions to prohibit the use of the Sambo's name would have resulted in the inestimable loss of and good will and reputation to Sambo's.

Sambo's did not petition the city to amend the site plan but rather instituted the present action on February 1, 1979 seeking declaratory and injunctive relief. Specifically, it sought a declaratory judgment holding the City's revocation of the sign

---

**2.** The Mayor also objected to the proposed restaurant and to proposals for a shopping center and a Ponderosa Steakhouse because of his reservations about strip zoning along West Stadium Blvd., the proposed location of all three concerns.

permits invalid and seeking approval for the continued operation of the Ann Arbor restaurant under the name "Sambo's." Sambo's also sought preliminary and permanent injunctive relief to enjoin the city from taking any action to prohibit or restrict its use of the name "Sambo's" in connection with the restaurant.

In its answer, the city asserted several defenses, based principally upon the claims that the use of the name "Sambo's" was not entitled to First Amendment protection and that Sambo's was barred from using that name because the site plan approved by the City Council in 1972 contained a binding agreement that the name "Sambo's" would not be used. Ann Arbor also filed a counter-claim seeking an injunction against continued use of the name "Sambo's." The City agreed, however, not to take any action to enforce the revocation of the sign permits pending a determination by the district court on Sambo's motion for a preliminary injunction. Pursuant to a stipulation by the parties, the trial on the merits was consolidated with the hearing on the preliminary injunction.

The district court subsequently found that the "agreement" executed by Sambo's contained a valid and enforceable provision proscribing use of the name "Sambo's" and that it was not induced by economic coercion. The court also found that Sambo's had knowingly waived any constitutional rights it may have had regarding use of the name "Sambo's." Accordingly, the court did not consider whether plaintiffs' use of the trade name "Sambo's" merited First Amendment protection. The court therefore denied Sambo's requests for declaratory and injunctive relief. The court also declined to assume jurisdiction over the city's state law counter-claim, leaving that matter to be pursued in state courts. The City has permitted the continued operation of the restaurant under the name "Sambo's" pending the outcome of this appeal.

## II.

### A.

Our analysis begins with the site plan proposal executed by Restaurant Properties acting for Sambo's and approved by the Ann Arbor City Council. The district court held that the statement not to use the name "Sambo's" in connection with the restaurant was a valid and binding agreement enforceable by the City of Ann Arbor. Sambo's attacks this holding on three counts. First, it argues that there was no legal consideration for the agreement; second, that the City unlawfully conditioned a public benefit on the relinquishment of First Amendment rights; and third, that the agreement was induced by economic coercion.

The district court found that the agreement made by Sambo's to refrain from the use of the name "Sambo's" was supported by consideration in the form of a benefit to Sambo's. Specifically, the court found four distinct benefits which accrued to Sambo's: first, Sambo's avoided further public discussion of the sensitive issue relating to the name; second, it avoided any possibility of an economic boycott; third, Sambo's received a *speedy* site approval, enabling it to open the restaurant without delay; and fourth, it avoided offending members of the City Council.

The district court also rejected Sambo's argument that the City had conditioned site plan approval upon the relinquishment of first amendment rights. Crucial to this holding was the absence of any direct or tangible evidence indicating an extra-legal proviso by the City. Specifically, the Mayor and other members of the Council had never informed Sambo's that forfeiture of its name was a condition precedent to acceptance of the site plan. In fact, the City Council never voted on the site plan while it contained the name "Sambo's"; in light of the reservations voiced by certain Council members the proposal was merely tabled for further examination. It was at this point that Sambo's made what the district court considered to be a reasoned business decision to change the restaurant's name in order to avoid offending members of the City Council and, hopefully, to expedite and

insure passage of the proposal. Sambo's thereby deliberately bypassed the opportunity to force a showdown on the name issue by awaiting City Council's vote on the proposal containing the name "Sambo's."[3]

Finally, the court found that the agreement was not induced by economic coercion. The court expressed its disbelief in such an argument, coming as it did from a corporation with over 1,000 operating restaurants. The cases relied upon by Sambo's were considered inapposite by the court. In both *Gordon v. Village of Wayne,* 370 Mich. 329, 121 N.W.2d 823 (1963) and *Ridgemont Development Co. v. City of East Detroit,* 358 Mich. 387, 100 N.W.2d 301 (1960), the Michigan Supreme Court held that the requirement by the cities that the plaintiffs provide the City with land (*Ridgemont*) or money (*Gordon*) as a condition precedent to site approval was unauthorized by the local statutes and constituted illegal coercion.

**B.**

■■■ The revocation of the sign permits clearly infringes on First Amendment rights and may permissibly do so only if it satisfies the standard for waiver of constitutional rights. In order to determine whether Sambo's waived its First Amendment rights then, we do not use Michigan contract law as the standard for waiver, since "the question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law." *Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 1247, 16 L.Ed.2d 314 (1966). Nor do we defer to the district court's finding of waiver as the City urges. Rather, whenever "constitutional rights turn on the resolution of a factual dispute we are duty

bound to make an independent examination of the evidence in the record." *Brookhart, supra,* at 4 n. 4, 86 S.Ct. at 1247 n. 4. Moreover, it is well established that courts closely scrutinize waivers of constitutional rights, and "indulge every reasonable presumption against a waiver." *Aetna Ins. Co. v. Kennedy,* 301 U.S. 389, 57 S.Ct. 809, 81 L.Ed. 1177 (1937); cf. *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977). In the First Amendment context the evidence must be "clear and compelling" that such rights were waived. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 145, 87 S.Ct. 1975, 1986, 18 L.Ed.2d 1094 (1967); see also *National Polymer Products v. Borg-Warner,* 641 F.2d 418 (6th Cir. 1981). Our task is to determine whether the City of Ann Arbor has "adequately justified its substantial restriction of protected activity." *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); *Keego Harbor Co. v. City of Keego Harbor,* 657 F.2d 94 (6th Cir. 1981).

The primary justification asserted by Ann Arbor in its attempt to legitimize its revocation of the sign permits is that Sambo's waived its First Amendment rights. The district court agreed, finding that Sambo's had "effectively and knowingly" forfeited its First Amendment rights through its conduct at the time of the site approval and subsequent thereto and through the explicit agreement not to use the name "Sambo's." The court noted that plaintiffs "were undoubtedly well advised of their constitutional rights, and were undoubtedly quite experienced in site approval situations." *Overmyer v. Frick,* 405 U.S. 174, 92

---

**3.** The City does not contend, nor could it, that the approval of the site proposal constituted consideration for the stipulation that the name "Sambo's" would not be employed in connection with the restaurant. Michigan law is clear that the performance of an existing legal obligation does not constitute consideration or sufficient consideration for a promise. *Ruffin v. Mercury Record Productions, Inc.,* 513 F.2d 222, 224 (6th Cir.), cert. denied, 423 U.S. 914, 96 S.Ct. 219, 46 L.Ed.2d 142 (1975); *Gordon v. Village of Wayne,* 370 Mich. 329, 121 N.W.2d 823, 824–25 (1963); *Puett v. Walker,* 332 Mich.

117, 50 N.W.2d 740, 743 (1952); *Green v. Millman Bros., Inc.,* 7 Mich.App. 450, 151 N.W.2d 860, 863 (1967). Michigan law is equally clear that once an applicant has complied with all applicable statutes and ordinances, as here site plan approval must be given. *Hessee Realty, Inc. v. City of Ann Arbor,* 61 Mich.App. 319, 232 N.W.2d 695, 698 (1975) (Construing the identical Ann Arbor ordinance applicable in the present case). In approving the site plan submitted by Restaurant Properties, the City Council did no more than what it was legally obligated to do.

S.Ct. 775, 31 L.Ed.2d 124 (1971) was cited as the governing case. In that case, Overmyer had contracted with Frick for the manufacture and installation by Frick of an automatic refrigeration system in a warehouse under construction. When Overmyer defaulted on its payments, Frick stopped the work in progress. After Overmyer had made partial payment, Frick completed the work to Overmyer's satisfaction. Overmyer then requested additional time to make payments, and after extensive negotiations between counsel, the two corporations entered into a cognovit clause valid under Ohio law in which Overmyer consented to a judgment against it should it default on subsequent payments. When Overmyer defaulted in payment, Frick exercised its contractual rights and obtained a judgment without notice or hearing. The Supreme Court held that a cognovit or confession of judgment clause was not *per se* unconstitutional. The Court applied the standard for determining the validity of a waiver in criminal cases—the "intentional relinquishment or abandonment of a known right or privilege," *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), and determined that the standard was satisfied. The Court based this conclusion on the fact that both parties to the contract were corporations which had equal bargaining power and which had bargained over the inclusion of the cognovit clause. Overmyer had also secured certain benefits such as the release of Frick's mechanics liens, a reduction in payments, and an extension of time, in exchange for the note. Moreover, the Court emphasized that Overmyer, the debtor, was not rendered defenseless by its execution of the cognovit clause. Overmyer could vacate the judgment upon showing a valid defense and had actually had a postjudgment hearing.

Unlike *Overmyer*, this case does not present a situation where there is an agreement which is binding as a matter of state contract law. *Overmyer* indicates, however, that in the civil context the presence of consideration will constitute some evidence of a waiver. We cannot find sufficient consideration here to evidence a waiver; the district court's findings of consideration were either inadequate as a matter of law or unsupported in the record as a matter of fact. The court first found that Sambo's avoided further public discussion of the sensitive issue. There is no evidence in this record to indicate that no further public discourse, in fact, took place, or that Sambo's received any benefit. The same is true of the court's finding that Sambo's benefitted by not offending members of City Council. There is substantial doubt as to the validity of this finding given the four dissenting votes from the site plan approval and the clear sentiments of other members, such as the Mayor. Not only is there an absence of tangible evidence showing that City Council members were unoffended, but there is even less support for the position that a benefit flowed to Sambo's. The only "benefit" was the approval of the site plan and that cannot constitute a consideration as it was an action required by law. The court also found that the name change preempted the possibility of an economic boycott, a finding wholly lacking in support. The City Council members remained free to boycott the restaurant if they chose. Nothing in the "agreement" prohibited the council members from organizing a boycott or otherwise exercising their own first amendment rights. Finally, the court cited speedy site approval as a benefit to Sambo's. This is legally inadequate insofar as the City Ordinance Code provided a timetable for resolution of site plan applications. That timetable was not adhered to in this case and it is impermissible to find that Sambo's benefitted by the City's decision to approve the plan rather than engage in protracted proceedings in the state courts.

The City concedes, as it must, that under the *Hessee* decision it possessed no legal basis for denying approval to the site plan proposal containing the name "Sambo's." Whether of the council's own volition or pursuant to a court order, approval would inevitably have followed; Sambo's had a clear right to use its name as a matter of Michigan law. Recognizing this, the City stresses that the concession on the name

issue was not a prerequisite or *quid pro quo* for site approval. The issue thus becomes whether there is something inherent in the stipulation not to use the name that makes it forever binding. Did Ann Arbor acquire some non-contractual authority by virtue of that stipulation which now permits it to suppress the use of the name "Sambo's" through the denial of sign permits. We think not. This situation is no different than if the original application had proffered the name "Jolly Tiger" and then in 1978, for the first time, an application to change the name to "Sambo's" was submitted. The unilateral, gratuitous nature of the stipulation, combined with the failure of Ann Arbor to demonstrate that it relied on the stipulation to its detriment, compels us to find it non-binding. Ann Arbor has failed to come forward with clear and compelling evidence that Sambo's waived its constitutional rights. It has not articulated a legitimate and persuasive reason for limiting Sambo's constitutional defenses aside from the meretricious fact that the company once made a decision not to assert its rights. We see no valid legal reason for denying Sambo's the opportunity to attempt to assert its First Amendment rights.

It is significant as well that Sambo's could not have asserted those rights in 1972. *Curtis Publishing, supra,* provides another reason for concluding that Sambo's did not waive its First Amendment rights. In *Curtis Publishing,* a public figure brought a libel action against a magazine publisher. At trial the defendant asserted no constitutional defense and the jury returned a verdict of general and punitive damages. After conclusion of the trial the Supreme Court decided *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), holding that the first amendment requires proof of "actual malice" before a public figure may recover damages in a defamation case. The defendant thereupon moved for a new trial, arguing that the actual malice standard of *New York Times* should apply. The trial court denied the motion, holding *New York Times* to be inapplicable. The court of appeals affirmed on the grounds that the defendant had waived any right to raise that challenge. The Supreme Court reversed, holding that the defendant had not waived its right to assert the previously unrecognized constitutional arguments by failing to assert them before trial. 388 U.S. at 142–45, 87 S.Ct. at 1984–86.[4]

This case presents an analogous assertion of a previously unrecognized constitutional defense. In 1972, "Sambo's," as a business appellation, was not protected by the First Amendment for as a matter of law commercial speech was beyond the scope of the First Amendment. *Valentine v. Chrestensen,* 316 U.S. 52, 54, 62 S.Ct. 920, 921, 86 L.Ed. 1262 (1942); *Breard v. Alexandria,* 341 U.S. 622, 642–3, 71 S.Ct. 920, 932–3, 95 L.Ed. 1233 (1951). *See also Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973) (advertisements held not protected were "classic examples of commercial speech"). Had Sambo's pressed the issue by insisting that the City Council vote on the site proposal containing the name "Sambo's," a rejection by the City Council would not have enabled Sambo's to subsequently invoke the First Amendment as a defense. Although the City lacked a legal basis for denying site plan acceptance—lacking legislation for regulating the content of trade names—Sambo's, on its own initiative, volunteered to operate its restaurant under an alternative title. Several years later the Supreme Court extended the protection of the First Amendment to commercial speech. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *see Metromedia Inc. v. City of San Diego,* —— U.S. ——, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); Comment, *First Amendment Protection for Commercial Advertising; The New Constitutional Doctrine,* 44 U.Chi.L.Rev. 205

---

4. The holding as to waiver in the plurality opinion authored by Justice Harlan was agreed to by two dissenting justices, *see* Brennan, J. dissenting joined by White, J. Id. at 172 n. 1, 87 S.Ct. at 2000 n. 1.

(1976). Sambo's, an unwitting beneficiary of that new constitutional doctrine, now asserts that the revocation of the sign permits violates its First Amendment rights.

The City argues that by stipulating on the site plan that the name "Sambo's" would not be used, plaintiffs waived any First Amendment rights. This argument assumes, of course, that Sambo's possessed First Amendment rights which it could waive. Clearly, Sambo's did not have First Amendment commercial speech rights in 1972 which it could waive. A waiver, at the least, is the relinquishment of a *known* right. *Johnson, supra.* Since Sambo's had no commercial speech rights protected by the First Amendment in 1972, it could not have waived any rights by stating that the name "Sambo's" would not be used in connection with the restaurant. *See e. g. United States v. Reader's Digest Ass'n, Inc.,* 464 F.Supp. 1037, 1048 (D.Del.1979).[5] Having concluded that Ann Arbor has not provided sufficient justification for its revocation of the sign permits on the waiver theory, we now turn to the speech itself.

### III.

The standard for measuring restrictions on commercial speech against the first amendment was recently refined in *Central Hudson Gas v. Public Service Comm.,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). The initial step requires a court to determine whether the expression is protected by the First Amendment. Once a court decides that issue in the affirmative, the state must then satisfy three requirements to justify any measure restricting commercial advertising. First, the restriction must serve a substantial state interest. Second, the regulation must directly advance the asserted governmental interest. Third, the restriction must be the least restrictive means for advancing the state's interest. *Id.* at 566, 100 S.Ct. at 2351.[6] *See e. g. Record Revolution v. City of Parma,* 638 F.2d 916, 936–37 (6th Cir. 1980).

The City of Ann Arbor need not run the full gauntlet of this analysis, for it has not attempted to regulate trade names. It seeks only to prevent Sambo's from using that name by arguing waiver, and in the alternative, that the trade name "Sambo's" is not protected by the First Amendment. This confines our task to determining whether "Sambo's" is constitutionally protected commercial speech. We do not address whether a municipality could, consistent with the First Amendment, restrict trade names it deems offensive. *See Sambo's of Ohio v. City Council of Toledo,* 466 F.Supp. 177, 180 (N.D.Ohio 1979).

---

5. In the criminal context we have held that the failure of a defendant to raise a previously unrecognized constitutional defense will not bar subsequent presentation of that claim. *See Isaac v. Engle,* 646 F.2d 1129 (6th Cir. 1980) (en banc), *cert. granted,* 451 U.S. 906, 101 S.Ct. 1973, 68 L.Ed.2d 294 (1981). Arguably, there are stronger reasons for finding waiver in the criminal context where a state has important interests in securing valid convictions and in avoiding the burden and expense of processing cases multiple times. *See generally* Westen, *Away From Waiver: A Rationale for the Forfeiture of Constitutional Rights in Criminal Procedure,* 75 Mich.L.Rev. 1214 (1977). Ann Arbor, on the other hand, has not demonstrated that it will suffer substantial prejudice if Sambo's is allowed to use the First Amendment to override the 1972 stipulation, nor has the City asserted any detrimental reliance on that stipulation.

   Since we hold that there was no valid waiver of First Amendment rights, we need not decide whether, had there been a waiver, it could be withdrawn notwithstanding the 1972 stipulation. *See Stevens v. Marks,* 383 U.S. 234, 243–44, 86 S.Ct. 788, 793, 15 L.Ed.2d 724 (1966) (a defendant is generally allowed to withdraw a prior waiver of a constitutional right when there is no justification otherwise). *But see Dukes v. Warden,* 406 U.S. 250, 266, 92 S.Ct. 1551, 1559, 32 L.Ed.2d 45 (1972) (Marshall, J., dissenting).

6. Undoubtedly this test requires the court to take a long, hard look at measures restricting nondeceptive commercial speech, while placing a heavy burden on the state to justify any restraint. *See* Cox, *The Supreme Court, 1979 Term-Foreword: Freedom of Expression in the Burger Court,* 94 Harv.L.Rev. 1, 35 (1980). Whether this is a "strict scrutiny" form of review or a quasi-deferential, intermediate level of review seems debatable. *See Central Hudson, supra,* 447 U.S. at 573–78, 100 S.Ct. at 2355–57 (Blackmun, J., concurring); *see also Friedman v. Rogers, supra,* 440 U.S. at 20, 99 S.Ct. at 899 (Blackmun, J., concurring and dissenting).

## A.

In determining whether a given commercial expression is protected by the First Amendment, the Supreme Court has identified at least two criteria: the speech cannot be deceptive or relate to unlawful activity. *Central Hudson, supra,* 447 U.S. at 566, 100 S.Ct. at 2351. For example, in *Friedman v. Rogers,* 440 U.S. 1, 10, 99 S.Ct. 887, 894, 59 L.Ed.2d 100 (1979) the Court upheld a ban on the practice of optometry under a trade name as a permissible requirement that commercial information " 'appear in such a form ... as is necessary to prevent its being deceptive,' " quoting from *Virginia Pharmacy, supra,* 425 U.S. at 772 n. 24, 96 S.Ct. at 1830 n. 24. *See also Ohralik v. Ohio State Bar Ass'n.,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978). And in *Pittsburgh Press Co. v. Human Relations Comm'n.,* 413 U.S. 376, 388, 93 S.Ct. 2553, 2560, 37 L.Ed.2d 669 (1973), the Court sustained an ordinance that had been construed to prohibit newspapers to carry purely commercial help-wanted advertisements in sex-designated columns except where the distinction was based upon a bona fide occupational exemption.

▪ The City of Ann Arbor does not contend that the name "Sambo's" is deceptive or relates to unlawful activity. Nor does the City deny that "Sambo's" is a valuable trade name which communicates useful information to consumers. To be sure, since its inception in 1957, the trade name "Sambo's" has received substantial promotion so as to acquire an identity in the eyes of the public. It conveys information because of the associations that have grown up over time between the name and the level of price and the quality of food and service. *See Friedman,* 440 U.S. at 16, 99

S.Ct. at 897. Clearly it conveys the type of information protected by the First Amendment, *see Virginia Bd.,* 425 U.S. at 765, 96 S.Ct. at 1827, as the First Amendment's concern for commercial speech is based on the informational function of advertising. *See First National Bank of Boston v. Bellotti,* 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978).

It also conveys to some citizens a pernicious racial stereotype of blacks as inferior. For example, "Sambo's" is no more than a form of latent vilification. The City, citing *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1949), urges that "Sambo's" is a racist trade name and that the use of words which, by their very utterance, inflict injury are not protected by the First Amendment. The Court in *Chaplinsky* affirmed a conviction under a statute that applied only to words with a direct tendency to cause violence by the persons to whom, individually, the words were addressed. *Id.* at 573, 62 S.Ct. at 770. The Supreme Court has refined its holding, however, so that suppression of speech which in no way tends to incite an immediate breach of the peace cannot be justified under *Chaplinsky's* "fighting words" doctrine. *Gooding v. Wilson,* 405 U.S. 518, 524–27, 92 S.Ct. 1103, 1107–08, 31 L.Ed.2d 408 (1977); *Lewis v. City of New Orleans,* 415 U.S. 130, 143, 94 S.Ct. 970, 972, 39 L.Ed.2d 214 (1974).[7]

We must also reject the proposition that otherwise protected commercial speech is stripped of that protection because of its ancillary offensiveness. The Court in *Virginia Board* noted that much commercial speech may be "tasteless and excessive," 425 U.S. at 765, 96 S.Ct. at 1827, but those characteristics alone could not justify re-

7. The City does not argue that use of the trade name "Sambo's" constitutes group libel. *See Beauharnais v. Illinois,* 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952) (affirming conviction under a state statute that proscribed public dissemination of any lithograph that vilified identifiable racial, ethnic or religious groups.) Although *Beauharnais* has never been overruled, its continued vitality has been questioned. *See Garrison v. Louisiana,* 379 U.S. 64, 82, 85 S.Ct. 209, 219, 13 L.Ed.2d 125 (1964)

(Douglas, J., concurring); *Collins v. Smith,* 578 F.2d 1197, 1205 (7th Cir.), *cert. denied,* 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978); *Tollett v. United States,* 485 F.2d 1087, 1094 n. 14 (8th Cir. 1973); *Anti-Defamation League of B'nai B'rith v. FCC,* 403 F.2d 169, 174 n. 5 (D.C.Cir. 1968), *cert. denied,* 394 U.S. 390, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969) (Wright, J., concurring). *But see* Note, *Group Vilification Reconsidered,* 89 Yale L.J. 308, 1450 (1979).

pression of the speech. And in *Carey v. Population Services Int'l.*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), the Court stated:

> Appellants contend that advertisements of contraceptive products would be offensive and embarrassing to those exposed to them, and that permitting them would legitimize sexual activity of young people. But these are classically not justifications validating the suppression of expression protected by the First Amendment. At least where obscenity is not involved, we have consistently held that the fact that protected speech may be offensive to some does not justify its suppression.

*Id.* at 701, 97 S.Ct. at 2024. In similar vein, Ann Arbor contends that the use of the name "Sambo's" to advertise a restaurant offends certain citizens and frustrates the City's policy of racial harmony and equality. Plainly, racial harmony and equality is a substantial state interest. *Cf. Linmark Associates, Inc. v. Willingboro*, 431 U.S. 85, 94–5, 97 S.Ct. 1614, 1619, 52 L.Ed.2d 155 (1977) (promoting stable, racially integrated housing a "vital goal"). Significantly, however, the City has produced no evidence to demonstrate that the actual operation of the restaurant under the name "Sambo's" has retarded or impeded achievement or furtherance of its goal or racial equality. Tangible evidence of the disruption of racial harmony in Ann Arbor because of the presence of a restaurant named "Sambo's" is not present in this record. The impact on these laudable goals by "Sambo's" is speculative at best. Much more than a speculative casual relationship is required for even though exposure to the "Sambo's" signs may offend some citizens, the ability of the City "to shut off discourse solely to protect others from hearing it is dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen v. California*, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971) *quoted with approval in Consolidated Edison v. Public Service Comm'n.*, 447 U.S. 530, 541, 100 S.Ct. 2326, 2335, 65 L.Ed.2d 319 (1980). *See also Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975); *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972). Having made no such showing, the City may not deny plaintiffs the constitutional right to use the trade name "Sambo's."

The decision of the district is reversed and the case is remanded for issuance of an order enjoining the City of Ann Arbor from denying plaintiffs the use of the trade name "Sambo's" or from revoking the sign permits heretofore issued.

MERRITT, Circuit Judge, concurring.

I agree with Section III of Judge Celebrezze's opinion that the use of the name "Sambo's," although offensive to blacks, is now commercial speech protected under the First Amendment. On the more difficult waiver issue discussed in Section II of the opinion, it is clear to me that the City of Ann Arbor engaged in an illegal form of economic coercion or duress in order to induce the company to contract away its constitutional right to use the name "Sambo's." The City threatened to refuse the building permit, an entitlement for which the company had satisfied all other state and local requirements.

The transcript of the record, as well as the newspaper report quoted in the opinion of the dissenting judge, shows that the mayor of Ann Arbor and members of the council at a council meeting said to the company that they were opposed to the project so long as "Sambo's" was used as the name. They then refused to pass the resolution permitting the permit to issue. The lawyer for the city then advised the company's lawyer that the resolution granting the permit would not pass unless the name was changed. The officials did not say to the company in words or effect "We find the name offensive but recognize your right to use it if you insist on it." They said in effect "We will not issue the building permit so long as you use the name 'Sambo's'." That is the only reading I can give to the record.

If the company has a right to use the name under the First Amendment, then the City may not threaten to refuse a building permit in order to induce a waiver any more than it may threaten an assault or other illegal conduct. In exchange for money or other legal consideration, the company may validly contract away its right to use the name "Sambo's." But we should not recognize as binding a contract obtained through assault, fraud, duress or extortion. See Restatement of Contracts, ch. 16, Duress and Undue Influence (1937); Restatement, of Restitution, ch. 3, Coercion (1937).

The Restatement of Contracts § 492 (1937) includes in the definition of duress "any wrongful threat ... that induces another to enter into a transaction under the influence of such fear as precludes him from exercising free will and judgment, if the threat was intended or should reasonably have been expected to operate as an inducement." In general, duress will render the transaction either void or voidable, *id.* at §§ 494–95, and the person who conferred the benefit is entitled to restitution. Restatement of Restitution § 70 (1937).

Our legal system does not permit a state or local school board to threaten the parents of black children with economic reprisals or boycotts in order to induce them to enter a contract foregoing their rights to the equal protection of the law. We should not enforce such a contract as a waiver of a constitutional right. Similarly, we cannot give binding effect to a contract or waiver based upon the threat to withhold a building permit until the applicant foregoes protected First Amendment rights.

KEITH, Circuit Judge, dissenting.

In a carefully considered and well-written opinion, Judge Julian Cook concluded that the plaintiff clearly waived any First Amendment rights it may have had to use the name "Sambo's" at its Ann Arbor restaurant. I think that the district court is absolutely correct. I find my colleagues' views to the contrary to be untenable. I respectfully dissent.

## I

Judge Celebrezze and Judge Merritt agree that the name "Sambo's" is protected by the First Amendment. They give different reasons, however, for their conclusion that the plaintiff waived any rights it may have had to use the name "Sambo's." Judge Celebrezze does not dispute the district court's finding that Sambo's voluntarily agreed not to use "Sambo's" as the name of its Ann Arbor restaurant. Judge Celebrezze notes that "Sambo's on its own initiative, volunteered to operate its restaurant under an alternative title." However, he concludes that no valid waiver occurred for two reasons: 1) Sambo's stipulation to forego the use of its name was non-binding; and 2) Sambo's First Amendment rights were not clearly established in 1972. Judge Merritt, on the other hand, reaches the same result on a simple coercion theory. He rejects the district court's finding that Sambo's voluntarily agreed to use another name and concludes that Sambo's did not waive its rights. My colleagues' views are difficult to reconcile. I will first discuss my colleagues' conclusion that use of the name "Sambo's" is protected by the First Amendment. I will then discuss the coercion theory advanced by Judge Merritt and Judge Celebrezze's position.

## II

Judge Celebrezze correctly points out that the standard for analyzing restrictions on commercial speech under the First Amendment was recently refined in *Central Hudson Gas v. Public Service Commission*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). There, the Supreme Court articulated a four-part test. First, a court must determine whether the expression is protected by the First Amendment. *Id.* at 566, 100 S.Ct. at 2351. Second, if the speech is indeed protected, then the Court must determine whether the asserted governmental interest is substantial. *Id.* Third, if the first two questions are answered affirmatively, the Court must determine whether the regulation directly advances the governmental interest asserted. *Id.* The final

question is whether the restriction is the least restrictive means for advancing the state's interest. *Id.*

As noted, Judge Merritt and Judge Celebrezze assume that the use of the name "Sambo's" is protected by the First Amendment. The Supreme Court has held, however, that some types of speech are not worthy of First Amendment protection. "Fighting words" are included in the category of unprotected speech. In *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1949), the Supreme Court defined "fighting words" as "those [words] which by their very utterance inflict injury or tend to incite an immediate breach of the peace." [1] Since the district court did not conduct a hearing to determine whether the word "Sambo's" is one which by its very utterance inflicts injury, it is difficult to understand how Judge Merritt and Judge Celebrezze concluded that the speech was protected. In fact, it has been determined in other contexts that the word "Sambo's" is indeed a "fighting" word.[2] Therefore, the district court should have conducted an evidentiary hearing to determine the threshold issue of whether "Sambo's" is a "fighting" word unworthy of First Amendment protection. Since the district court did not conduct a hearing, I would remand this case so that it can be determined whether the word "Sambo's" creates injury by its very utterance. Assuming *arguendo* that the First Amendment protects the use of the name "Sambo's," Judge Merritt and Judge Celebrezze's opinions are still untenable.

## III

### A

Judge Merritt, in his concurring opinion, concedes that "in exchange for money or other legal consideration, the company may validly contract away its right to use the name 'Sambo's.'" *Supra* at 696. He concludes, however, that the City of Ann Arbor engaged in an illegal form of economic coercion or duress in order to induce the company to contract away its constitutional right to use the name "Sambo's." *Supra* at 696. Judge Merritt premises his rather creative argument on an incorrect statement of Michigan contract law. More importantly, even if Judge Merritt's statement of Michigan's contract law is correct, the facts of this case are devoid of any evidence of duress or coercion.

Judge Merritt's opinion reveals a misapprehension of Michigan contract law. Michigan follows the general contract rule that a contract entered into under duress is voidable by the party constrained. Michigan courts have held that:

"Duress exists when one, by the unlawful act of another, is induced to make a contract or perform some act under the circumstances which deprive him of the exercise of free will." *See, e. g., Knight v. Brown*, 137 Mich. 396, 100 N.W. 602 (1904); *Norton v. State Highway Dept.*, 315 Mich. 313, 319, 24 N.W.2d 132 (1946); *Barnett v. International Tennis Corp.*, 80 Mich.App. 396, 263 N.W.2d 908 (1978).

However, Michigan law does not recognize:

"Duress by mere suggestion, advice or persuasion, especially where the parties

1. The viability of the disjunctive test—"words which by their very utterance inflict injury or tend to incite an immediate breach of the peace"—first articulated in *Chaplinsky* cannot be questioned. *See Lewis v. City of New Orleans*, 415 U.S. 130, 132, 94 S.Ct. 970, 972, 39 L.Ed.2d 214 (1973); *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1971). *See also United States v. Occhino*, 629 F.2d 561, 562 n. 6 (8th Cir. 1980).

2. The factual findings of the Rhode Island Human Rights Commission in *Urban League of Rhode Island, Inc. v. Sambo's of Rhode Island, Inc.*, State of Rhode Island Commission for Human Rights Decision, File Nos. 79 PRA 074–06/06, 79 ERA 073–06/06 (March 16, 1981), are significant: "All of the witnesses [those black and white] who were asked about the name 'Sambo' with the exception of respondent's [Sambo's] employees, Mr. Marable and Mr. Bennett, testified that they thought that the word was offensive and demeaning to black Americans. Eleven of the black Americans who testified said that they considered 'Sambo' to be a fighting word. Nine black Americans testified that they had, in the past, physically fought with people who had called them 'Sambo'." *Id.* at 6.

are at arm's length and represent opposing interests." *See, e. g., Clement v. Buckley Mercantile Co.*, 172 Mich. 243, 255, 137 N.W. 657 (1912); *Barnett v. International Tennis Corp., supra.*

Moreover, duress will not invalidate a contract entered into with full knowledge of all the facts and with ample time and opportunity for investigation, consideration, consultation and reflection. *See, e. g., Payne v. Cavanaugh*, 292 Mich. 305, 308, 290 N.W. 807 (1940); *Apter v. Joffo*, 32 Mich.App. 411, 189 N.W.2d 7 (1971). Therefore, even if Judge Merritt assumes that the Ann Arbor City Council's actions constituted economic coercion, that coercion would not invalidate the contract between Sambo's and the Ann Arbor City Council. The Ann Arbor City Council did not engage in any unlawful act nor did it threaten to do so. While the City Council did pass a resolution suggesting that the restaurant owners change the name, that resolution does not constitute duress under Michigan contract

law. The City Council realized that it had no legal right to prohibit "Sambo's" from using its name. Sambo's also realized that it had a right under Michigan law to use its name. Sambo's was represented by counsel at all times. Thus, there can be no question that it entered into the agreement with the Ann Arbor City Council with full knowledge of all the facts. Sambo's, like any other party bargaining at arm's length, simply made a business decision not to use its name.                ♦

**B**

Assuming *arguendo* that Judge Merritt has correctly construed Michigan contract law, the facts of this case do not demonstrate either duress or economic coercion. This case is problematic because no trial took place below. The parties stipulated to the facts. The stipulation presents only a vague picture of what happened when Sambo's applied for site plan approval for its restaurant.[3] Nevertheless, I think that a

---

3. The stipulation reads, in its entirety, as follows:

**STIPULATION OF FACTS**
(Filed April 4, 1979)

For purposes of the consolidated trial on the merits and hearing on the application of Plaintiffs for a Preliminary Injunction and reserving all objections as to relevance,

IT IS HEREBY STIPULATED by and between the parties hereto, through their respective counsel of record, as follows:

1. Sambar Properties, Inc. ("Sambar") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York, and is the owner of certain premises located at 2080 W. Stadium Blvd., Ann Arbor, Michigan.

2. Sambo's Restaurants, Inc. ("Sambo's Restaurants") is a corporation organized and existing under the laws of the State of California, with its principal place of business in Santa Barbara, California, and is engaged in the business of developing, managing and operating a chain of restaurants. Sambo's Restaurants leases from Sambar and manages and operates the restaurant located on the premises known as 2080 W. Stadium Blvd., Ann Arbor, Michigan.

3. Sambo's Restaurants operates more than 1,000 restaurants bearing the name "Sambo's". Those restaurants are located in 47 states.

4. On June 17, 1957 Sam Battistone and F. Newell Bohnett, Co-chairmen of the Board

of Directors of Sambo's opened the original Sambo's. At that time, Sam D. Battistone, son of Sam Battistone, and currently President and Chief Executive Officer of SRI, suggested the name "Sambo's" as an appropriate name for a pancake house restaurant concept. Sam D. Battistone suggested this name because it conjured up associations with pancakes and had the happy coincidence of combining his father's first name and a portion of Mr. Bohnett's last name.

5. The word "Sambo" is offensive to some Black people if directed at them. The use of the name "Sambo's" in connection with the restaurant is offensive to some people. Other people, including Black people, are not so offended.

6. Sam D. Battistone did not and Plaintiffs do not intend that the name "Sambo's" be insulting, degrading or offensive to any persons.

7. The name "Sambo's" is registered with the United States Patent and Trademark Office under 15 U.S.C., § 1051 and has been so registered at all times since 1971.

8. Sambo's Restaurants has invested substantial sums and efforts in developing the name "Sambo's" in the 22 years since its incorporation. These sums and efforts have contributed to the substantial goodwill Sambo's Restaurants attributes to its name. The Sambo's name is a valuable property interest which is used in interstate commerce to provide a common advertising and marketing

Note 3—Continued

theme for all of its restaurants and to convey to the traveling and local public the image of a restaurant where it can find uniform good food, good service and high quality at reasonable prices.

9. It has been the corporation's experience that the use of the name "Sambo's" greatly increases the marketability of Sambo's Restaurants' services and products. Since January of 1970, Sambo's Restaurants has expended over $31 million in national advertising, familiarizing the general public with its name "Sambo's" and said name has achieved a great deal of public identity by being associated with its products and services. Presently, Sambo's Restaurants' national advertising budget is approximately $4.4 million.

10. The City of Ann Arbor is a municipal corporation, located in the County of Washtenaw, State of Michigan.

11. George W. Gardner is a citizen of the State of Michigan who resides in Washtenaw County, Michigan. Mr. Gardner is the Bureau Director of the Ann Arbor Building Department.

12. G. M. Scofield is a citizen of the State of Michigan who resides in Washtenaw County, Michigan. Mr. Scofield is the Zoning Coordinator of the Ann Arbor Building Department.

13. The matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs.

14. On or about December 17, 1971, in accordance with the Ann Arbor City Ordinance Code, Sambo's Restaurants, acting through its wholly-owned subsidiary, Restaurant Properties, Inc., filed an application with the City of Ann Arbor for site plan approval for the construction of a restaurant within the City of Ann Arbor to be located at 2080 W. Stadium Blvd.

15. Site plan approval by the City Council of the City of Ann Arbor was a condition precedent to the construction of the restaurant.

16. Although other problems existed with the site plan at earlier stages of the application procedure, by the time of its submission to the City Council, the site plan complied with all applicable ordinances and regulations of the City of Ann Arbor.

17. In the fall of 1972, Sambo's Restaurants learned that some members of the City Council and the Mayor of Ann Arbor objected to the use of the name "Sambo's" in connection with the restaurant.

18. Members of the City Council and the Mayor objected to the use of the name "Sambo's" because of its allegedly offensive connotations.

19. Initially, the Mayor also objected to the proposed restaurant because of his objections to strip commercial zoning along West Stadium Blvd.

20. The Mayor also objected to the site plan proposed at the same time for the Stadium Row Shopping Center and the site plan proposed for a Ponderosa Steak House because of his objections to strip-zoning.

21. At a November 13, 1972 meeting of City Council, the Mayor initially recommended approval of the Ponderosa and Sambo's site plans because the City had no legal basis for denying the plans.

22. At the November 13, 1972 meeting, one member of the Ann Arbor City Council, Norris Thomas, stated: "I cannot, on the basis of the name alone, support this and will personally lead an economic boycott of [the restaurant] if erected under [the name "Sambo's"]." The Mayor echoed support for these comments as did other council members.

23. Although the Ponderosa Steak House site plan was approved at the November 13, 1972 meeting, the Sambo's Restaurant, Stadium Row Shopping Center and Maple Village site plans were tabled.

24. Based upon comments by City Council members and the Mayor of the City of Ann Arbor during the course of the November 13, 1972 meeting and other public meetings, the attorneys for Restaurant Properties, Inc. understood and believed that the site plan would not be approved by City Council unless Restaurant Properties agreed not to use the name "Sambo's" in connection with the restaurant. Restaurant Properties, Inc. and Sambo's Restaurants were so advised.

25. Therefore, Restaurant Properties, Inc., through its attorney, stated on the official site plan on November 21, 1972, that the name "Sambo's" will not be used in regard to this restaurant". A copy of the portion of the Site Plan containing such statement is attached hereto as Exhibit A.

26. At the December 4, 1972 meeting the Sambo's Restaurant site plan was approved by a 7 to 4 vote. Voting in favor were: Mayor Harris, Councilmen Fairbanks, McCormick, Brenner, Hadler, Colburn and Faber. Voting against were: Councilwoman Wechsler, Councilmen Meade, DeGrieck and Thomas.

27. Restaurant Properties would not have stated that it would not use the name "Sambo's" if it had not been advised and had not believed that the site plan would not otherwise be approved.

28. Following approval, Sambo's Restaurants constructed the restaurant and operated it under the name of "Jolly Tiger". In 1975 Sambo's Restaurants sold the restaurant to Sambar, and leased it back for a term of 22 years at a basic semi-annual rental of $19,443.61.

29. It cost approximately $200,000 to equip the Ann Arbor, Michigan restaurant.

fair reading of the stipulation fully supports the district court's findings.[4]

Substantially all that equipment was shipped from outside of the State of Michigan. At least half of the food and supplies regularly used in the operation of the Ann Arbor restaurant is shipped from outside the state. The approximate annual cost of the food and supplies shipped from outside of the State of Michigan is $150,000.

30. The operation of the restaurant under the name "Jolly Tiger" has been unprofitable, and in 1978, it lost in excess of $18,000.00. During the year 1978, Sambo's operated 14 "Jolly Tiger" restaurants nationwide. These restaurants averaged a net loss of $11,687.00 per restaurant for 1978.

31. Because the Ann Arbor "Jolly Tiger" was operating at a loss, on or about December 6, 1978, Sambo's Restaurants instructed Michigan Signs, Inc. to make application on its behalf to the Ann Arbor Building Department for sign permits for two building signs displaying the name "Sambo's" to be erected on the restaurant.

32. On or about December 7, 1978, Michigan Signs, Inc. filed two applications for sign permits with the Ann Arbor Building Department. Copies of the two applications are attached hereto as Exhibits B and C.

33. On December 19, 1978, sign permits were issued by the City of Ann Arbor and signed by the Defendant, George W. Gardner. Copies of said permits are attached hereto as Exhibits D and E.

34. On or about December 28, 1978, Michigan Signs, Inc. erected the two "Sambo's" signs authorized by the aforesaid sign permits.

35. On or about January 2, 1979, Defendant, G. M. Scofield sent a letter, a copy of which is attached hereto as Exhibit F, to Michigan Signs, Inc. revoking the sign permits.

36. Except for the alleged violation of the agreement referred to in the aforesaid letter, no violation of any City ordinance exists with respect to the signs.

37. If the Court denies Plaintiff's request for injunctive relief, Defendants will proceed to ticket Plaintiffs for violation of the City's sign ordinance and take whatever further steps, if any, are necessary to force Plaintiffs to remove their signs.

38. The Complaint in this action was filed on February 1, 1979. Defendants have agreed not to take any further action to enforce the revocation of the permit pending determination by this Court of the merits of Plaintiffs' action. Plaintiffs have agreed not to erect any additional signs authorized by the permits heretofore issued by the City pending such determination.

39. In 1963, the City of Ann Arbor adopted Chapter 112 of the City Code, dealing with non-discrimination. Since that time, that Chapter has been amended several times to improve its effectiveness. A copy of the present form of the Chapter is attached hereto and marked Exhibit G.

40. The City of Ann Arbor has also adopted "affirmative action" programs to encourage the hiring of minorities by the City and by businesses having contracts with the City.

41. For the purpose of implementing the above described ordinance and programs, the City has established a Human Rights Commission and has a full-time Human Rights Department.

42. Plaintiffs have not petitioned the City to amend the site plan for the restaurant.

4. The district court's findings are subject to review under the clearly erroneous rule of Fed. R.Civ.P. 52(a). *See United States v. United States Gypsum*, 333 U.S. 364, 394, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); 9 C. Wright & A. Miller, Federal Practice & Procedure § 2587. His findings are not clearly erroneous; I think that summary affirmance is proper for this reason alone.

Judge Celebrezze reiterates established law that courts "closely scrutinize waivers of constitutional rights, and indulge every reasonable presumption against a waiver." *Ante* at 690 (citations omitted). I question whether the high waiver standard traditionally used in First Amendment cases should apply here. *Cf. Overmyer v. Frick Co.*, 405 U.S. 174, 185–86, 92 S.Ct. 775, 782, 31 L.Ed.2d 124 (1972) (assuming, without deciding, "that the standard for waiver in a corporate-property-right case . . . is the same standard applicable to waiver in criminal proceeding, that is, that it be voluntary, knowing, and intelligently made . . ."). The plaintiff is a large corporation, which was at all times represented by counsel. We should presume that any business decision the company makes is made voluntarily and intelligently. Otherwise, the federal courts will face increasing numbers of cases such as this one where we have the spectacle of a company making an extraneous duress argument in a vain effort to escape a clear business decision.

However, even assuming that the high waiver standard advanced by Judge Celebrezze applies to this case, I do not interpret that standard as overturning the clearly erroneous rule.

In any event, for reasons spelled out below, I think that careful scrutiny of the record reveals that the district court's findings are clearly correct.

Several facts are critical to a clear understanding of this case. First, Sambo's is a

large corporation which was represented by counsel at all times.[5] Second, the City Council never threatened to deny site plan approval nor did it ever vote against approval. A vote concerning the approval of Sambo's site plan was merely postponed for less than a month. No evidence on this record indicates that the Sambo's site plan application was singled out for special treatment. The Sambo's site plan *and* the site plans of two other commercial establishments were tabled due to objections raised during the November 13, 1972 meeting. Finally, it is undisputed that Sambo's had a clear right as a matter of state law to have its site plan approved. Counsel for Sambo's knew this, and the Mayor of Ann Arbor openly stated that this was true at the November 13 meeting. Counsel for Sambo's did not wait for a vote on the application, nor did counsel argue the issue. Instead, counsel agreed to not use the name "Sambo's" at the restaurant and personally signed a statement to that effect on the site plan. There is no question that Sambo's attorneys consulted with Sambo's corporate officers in making this decision.

The reason Sambo's agreed to forego the use of its name although it knew it had a clear legal right to use the name "Sambo's" was clear to the district judge below, and it is clear to me. It wanted to avoid unfavorable publicity. Sambo's had a right to use its name. The Ann Arbor community and the city council, however, had a right to inform Sambo's of their negative reaction to that name.

The stipulated facts gloss over the offensiveness of the name "Sambo's" to the Ann Arbor community in general and the black community in particular. Given the history of the name "Sambo's," its inherent offensiveness is clear:

> A comparative examination of British and American dictionaries reveals a long etymological history for the name of "Sambo," with documented references as early as 1564. In America, it was apparently used first by the Spanish as a name for individual slaves and as a generic term for a "half-breed" child of black and native American Indian parents. In racially conscious Southern society, it later came to mean the child of a black person and a "mulatto," denoting one-quarter white ancestry as "quadroon" was used for those who were "three-quarters white." The name "Sambo" was commonly found in the entertainment field, where the popular black-face minstrels had made use of it as early as 1837 in their routines of jokes and ridicule. By the mid-1800's, the term was commonly employed to refer to any black man, often with derision and contempt, and was used through the mid-twentieth century as a "nickname" to call porters, shoe-shiners, etc.

P. Yuill, *Little Black Sambo: The Continuing Controversy*, School Library Journal 74 (March 1976). The term "Sambo" is as derogatory today as it was fifty years ago. Blacks react to the word "Sambo" in the same manner that they react to the word "Nigger." It has been judicially determined that the mere use of the word "Sambo" will precipitate a violent reaction when directed at blacks. *Urban League of Rhode Island, Inc. v. Sambo's of Rhode Island, Inc.*, State of Rhode Island Commission for Human Rights, Decision File Nos. 79 PRA 074–06/06, 79 ERA 073–06/06 at 5, 6 (March 16, 1981), *appeal pending*, Rhode Island Superior Court. Many blacks have physically fought individuals who have called them "Sambo." *Id.* Moreover, recent employment discrimination cases indicate that use of the term "Sambo" is substantive evidence of racial harassment and employment discrimination. For example, in *EEOC v. Murphy Motor Freight Lines*, 488 F.Supp. 381 (D.Minn.1980), a Title VII case, the court held that the following statement shouted during the lunch hour constituted racial harassment: "He [a white] would say, 'What are you reading?'

---

**5.** The district court correctly relied on *Overmyer v. Frick Co., supra* at 186–87, 92 S.Ct. at 782–83, where the Court found a valid waiver of due process rights. In *Overmyer*, the Court emphasized that the plaintiff was a corporation, that there was no uneven bargaining power and that there was no refusal on defendant's part to deal with plaintiff unless plaintiff agreed to a waiver. All of these factors are present here.

The guy [another white] would say, 'I am reading about a black guy named Sambo. He's got a pancake." [6] *See Fred Meyer v. Bureau of Labor*, 39 Or.App. 253, 592 P.2d 564 (1979).[7] *See also Jenkins v. General Motors Corp.*, 354 F.Supp. 1040, 1043 (D.Del. 1973); *Edwards v. Fourcar, Ray & Simon, Inc.*, 23 Fair Empl.Prac. Cases 1640, 24 Empl.Prac. Dec. ¶ 31,208 (N.D.Cal.1980).

The offensiveness of the word "Sambo," however, does not turn on whether it has been directed at any particular individual. The term "Sambo" is derogatory in any context. The story *Little Black Sambo*[8] is a children's book, yet it too is offensive:

"The characters are harmless enough and so is the little fantasy; but the bad carry-over is tagging every Negro, Sambo or Black Sambo. This is as repulsive as Dago, Heinie, Wop, as stigmatizing names for other groups."

P. Cornelius, *Interracial Children's Books: Problems and Progress*, Library Quarterly (April 1977).

There can be no doubt that the name "Sambo's" is offensive and harms the general community by promoting racial insensitivity. This offensiveness and harm is not lessened simply because the word is contained in an advertisement or placed on a

---

**6.** We note with particular interest that the derogatory term "Sambo" appears to have recently become associated with breakfast foods. Sambo's restaurants' reputation is based primarily on breakfast foods.

**7.** In *Fred Meyer, supra*, 39 Or.App. 253, 592 P.2d at 567, the court held that although the supervisor intended his comments to be humorous, the telling of a number of Black Sambo jokes represented "prejudicial stereotypes and interpersonal insensitivity." Such conduct constituted humiliating racial harassment and was a violation of the Oregon civil rights statute. *Id.*

**8.** Nor is the famous story of Little Black Sambo as innocent as it is made out to be in footnote 1 of Judge Celebrezze's opinion. Helen Bannerman's original 1899 story was published in numerous English-language versions, at least 31, and was translated into several languages. Many of these editions contained stereotypical illustrations of black characters in the story. *See* P. Yuill, *Little Black Sambo: A Closer Look* (Council on Interracial Books for Children 1976). In fact, the head of special collections at Fisk University has stated:

Undoubtedly, a dark and backward step in publishing history with regard to Negro children was taken in 1900 when Helen Bannerman's *Little Black Sambo* was first published. Even though some defending white librarians may contest this by saying that the book was actually about a little Indian boy, the ludicrous illustrations of thick red lips, and kaleidoscopic clashing colors of red coat, blue pants, purple shoes with "crimson soles and crimson linings," overtopped with a green umbrella, and replete with the name of Sambo, marked the model stereotyped caricature of Negros to white children for generations. The devastating effect of this story has without question cast a long ugly shadow on the developing minds of white children by giving them a model caricature that demeans and ridicules black children.

A. Shockley, *Tell It Like It Is: The New Criteria for Children's Books in Black and White*, Southeastern Librarian (Spring 1970).

The story's net effect on black children is well summarized in P. Yuill, *Little Black Sambo: The Continuing Controversy, supra* at 74:

Black children were taunted with "Black Sambo" while on the playground, were embarrassed and angry whenever the story was told or read. Such a painful experience that occurred in the mid-1940's was recalled by social worker Marjorie Hammock in a letter to the Council on Interracial Books for Children:

Your article on Little Black Sambo made me recall for the first time in years the very painful experience of hearing the story read by a teacher in my school ... (Westport, Connecticut). I remember how some of my classmates would refer to me as Black Sambo after hearing the story (they were too sophisticated to say nigger) and how for the first time I didn't want to go to school ever! To this day, I hate that teacher and the principal who told my mother it was harmless. Similarly, a barber from Nebraska gave a graphic description to the Kerner Commission's investigation into rioting and unrest among the nation's black population in the late 1960's. Among other remarks, he said: I sat through Little Black Sambo. And since I was the only black face in the room, I became Little Black Sambo ... Well, how do you think we feel when an adult ... (we teach our child to respect that adult) and that adult gives these little white kids bad names to call him? Why don't you have Little Cracker Bohunk? Little Cracker Dago? Little Cracker Kike? You can't stand that. But yet you're going to take our little black children and expose them to this kind of ridicule, then not understand why we don't like it. (Citations omitted)

sign 30 feet in the air. The Ann Arbor City Council recognized the offensiveness of the Sambo's name and passed a resolution condemning its use. The City of Toledo went further and passed an ordinance barring the use of the name "Sambo's." *See Sambo's of Ohio, Inc. v. City Council of Toledo*, 466 F.Supp. 177 (N.D.Ohio 1979).

In fact, it has been determined that the Sambo's restaurant sign is offensive to blacks, and injures their rights and privileges as citizens. In *Urban League of Rhode Island, Inc. v. Sambo's of Rhode Island, Inc., supra*, the Rhode Island Human Rights Commission, after Sambo's had an opportunity to defend itself in an adversary hearing, found that: Sambo's "knows and has known that many black persons in the Rhode Island community find the name offensive." [9] *Id.* at 18. The Commission held that the use of "Sambo's" restaurant advertisements and signs had such a negative impact on blacks in Rhode Island that the mere use of the name violated the Rhode Island Public Accommodation Act, Title 11, Chapter 24, of the General Laws of Rhode Island. The Commission reasoned that the offensiveness of the name necessarily operated to discourage black patronage and promote unequal access to public accommodations. Consequently, Sambo's restaurants were ordered to cease and desist using the name "Sambo's."

Sambo's had a legitimate business incentive to avoid the controversy which would have inevitably developed had it persisted in its desire to use the racially offensive name "Sambo's." Sambo's agreed to waive the use of its name to avoid adverse public discussion. The potential controversy and economic boycott by private citizens persuaded Sambo's to call its restaurant the "Jolly Tiger."

Sambo's simply made a business decision to forego the use of its name in order to avoid controversy.[10] As counsel for Sambo's stated at oral argument before the district court, "[Sambo's] thought, in a business decision, it might be able to proceed profitably under the name Jolly Tiger." I would also like to think that Sambo's recognized that its name was offensive to Blacks and the Ann Arbor community in general. Its decision to use the non-offensive name "Jolly Tiger" was simply a business decision.

Judge Merritt, in his concurring opinion, states that "[t]he lawyer for the city ... advised the company's lawyer that the resolution granting the permit would not pass unless the name was changed." *Supra* at 695. However, there is absolutely nothing

---

9. This finding was "overwhelmingly corroborated" by an investigative survey conducted by the Rhode Island Human Rights Commission staff and the testimony at the hearing. "All of the witnesses [those black and white] who were asked about the name 'Sambo' with the exception of respondent's employees, Mr. Marable and Mr. Bennett, testified that they thought that the word was offensive and demeaning to black Americans." *Urban League of Rhode Island, Inc. v. Sambo's of Rhode Island, Inc., supra* at 6. Of 238 persons surveyed by the Commission, "214 people stated that they would not patronize the restaurant [Sambo's] because of the name." *Id.* at 7. The Rhode Island Human Rights Commission also found that:

   The complainants [the Rhode Island Urban League] proved that respondent's [Sambo's] use of the name "Sambo's" resulted in an indirect refusal, withholding and denial of the accommodation facilities and privileges of respondent's places of public accommodation to black persons because of their race. The complainants proved that respondent's use of

the name "Sambo's" in publications, communications, notices and advertisements had the effect of notifying black persons that the accommodations, advantages, facilities and privileges of respondent's places of public accommodation would be denied to them because of their race. The complainants also proved that respondent's use of the name "Sambo's" in publications, communications, notices and advertisements had the effect of notifying black persons that their patronage was unwelcome, objectionable and not acceptable, desired or solicited. *Id.* at 17.

   These findings are particularly significant because Sambo's apparently had a full and fair opportunity to present evidence that the Sambo's name was not derogatory and demeaning to blacks. The findings of this neutral trier of fact are entitled to great weight.

10. This is particularly true since Ann Arbor is the location of the University of Michigan, with its large student population. Ann Arbor also has a sizeable black community.

in the record to support this statement. The only duress, threats and/or economic coercion which is alleged by Sambo's occurred at the November 13, 1972 meeting. There are no other allegations of statements or actions which occurred at any other time.[11] It is clear that some members of the City Council objected to the use of the name "Sambo's". Given the offensiveness of the name to all those who are sensitive to racial issues and race relations, their objections were responsible. However, the City Council knew that it had no right to deny approval of the site plan simply because the name "Sambo's" was offensive. Indeed, the Mayor openly confirmed this fact. There is simply no evidence of duress, economic coercion or any kind of coercion exerted upon Sambo's. An article in the *Ann Arbor News* of November 14, 1972, contains the best synopsis of what transpired. This article is part of the record and reads as follows:

### MAYOR URGES STRIP–ZONING CONTROLS

Ann Arbor Mayor Robert J. Harris Monday night made a plea for the City's Planning Commission to begin steps to strip commercial zoning along W. Stadium Blvd. and in other areas of the City.

Mayor Harris asked the Commission to give priority for its staff to begin work in eliminating possible zonings that lead to strip development, and to come up with technical amendments to the City's land use regulations to allow council to deny site plans that are undesirable.

Harris' comments came as council considered three site plans for developments in the W. Stadium area, all of which had been recommended for denial by the Planning Commission, but only one of which will probably end up facing stiff resistance.

11. At oral argument before the district judge, counsel for Sambo's stated that Sambo's subjective belief that it would be denied site plan approval was based on the public statements at the city council meeting and not anything else. Counsel stated:

Council approved a proposed site plan for a Ponderosa Steak House on Stadium near Liberty, held up a second site plan for a Sambo's restaurant because of alleged racial undertones in the name, and delayed action on a third plan for a 10-acre shopping center until attempts to rezone that site are finished.

Harris grudgingly recommended that council approve the Ponderosa and Sambo's site plans because he said the City has no legal basis for denying the site plans. However, he said action should be withheld on the Stadium Row Shopping Center, also scheduled for the W. Stadium area in anticipation of a court battle. The Mayor also indicated the City may fight in court the proposed Packard Platt Plaza Shopping Center planned for southeast Ann Arbor.

"The public should realize that the City's planning process has failed as regards to preventing of strip commercial development on W. Stadium," the Mayor said. And while it may be too late to stop some of the undesirable developments already in process, he said steps can be taken to avoid future problems of this nature.

He specifically asked the commission to assign its staff's limited time to the rezoning of raw land that is badly zoned and not yet far along in the construction planning stage.

He also urged the planning staff to use all speed in submitting to council technical amendments to the land use laws which would permit the denial of site plans deemed undesirable.

While council passed the Ponderosa development site plan, it withheld action on the Sambo's restaurant after First Ward Councilman Norris Thomas objected to what were termed the racial tones of that name.

"Recollection of the parties are really too vague to find out whether there were any private meetings or not . . . We tried."

Thomas, a black, stated that he was "positively astounded by the attempt to establish a restaurant which by its very name seeks to degrade, as well as invite the hostility to an already very volatile segment of this society. This City has worked too hard to create racial harmony and equality at this point to embrace that which represents the anthema to that policy."

The Councilman added that, "I cannot, on the basis of the name alone, support this and will personally lead an economic boycott of it if erected under this name." He predicted that if the establishment keeps the name, it will not survive long.

Mayor Harris echoed support for Thomas' comments, as did other council members, and Thomas was asked to prepare a resolution for future action to urge the owners of the restaurant to change the name.

The absence of duress or coercion is clear from the *Ann Arbor News* article. First, Mayor Harris recommended site approval of the Sambo's restaurant, recognizing that there was no legal basis to deny approval. Second, City Councilman Norris Thomas used strong language in objecting to the use of the name "Sambo's". However, there is no evidence that Thomas intended further action in his capacity as councilman concerning Sambo's request for site plan approval. It would have been futile for Thomas to urge that the City Council deny site plan approval to the Sambo's restaurant. Sambo's could easily reverse that decision in the state courts.[12] Nor should we assume that Thomas and the other members of the City Council would disregard the law. The only action Thomas threatened to take was in his role as a private citizen. He threatened to lead an economic boycott of the restaurant if it bore the name Sambo's. It is clear that this potential economic boycott was the only threat

Sambo's faced. In fact, even Sambo's has to concede that Councilman Thomas had a First Amendment right to state his views and lead an economic boycott.

One final factor deserves special emphasis. Acting as their constituents' representatives, Mayor Harris and other City Council members endorsed Thomas' comments. "[The Council then] asked [Thomas] to prepare a resolution for future action to urge [sic] the owners of the restaurant to change the name." App. at 13. As noted, a vote concerning the site plan's approval was postponed for less than a month. The site plan was not singled out for special treatment. Thus, the City Council acted properly at all times and did not condition approval on Sambo's relinquishing its right to use of its name.

The parties stipulated that Sambo's subjectively believed that the site plan would not have been approved absent agreement not to use the name "Sambo's". As the district court noted, however, nothing in the record supports this belief. Given the feelings expressed by Councilman Thomas, the company may have thought that the City Council might deny its site approval. However, no action or words by Council members supported this subjective belief. In fact, the Council knew that Sambo's had a state law right to have its site plan approved. Thus, Sambo's subjective belief without any tangible evidence is insufficient to support an inference of duress or coercion.

As noted, Sambo's did not let the issue develop any further. Sambo's promptly agreed not to use its name and to call the restaurant the "Jolly Tiger". The company now argues that the Ann Arbor City Council unlawfully conditioned its approval of the site plan and acted wrongly "in refusing to grant site plan approval unless [plaintiff] agreed not to use the name Sambo's." Brief for Appellant at 11. Judge Merritt's

12. "[O]nce the requirements of "statute, ordinance and regulation" have been satisfied, the commission must approve the site plan. We find the same limitations to apply to the city council. Its review is similar to that of an appellate court. The council can only review the site plan to determine if the planning commission has correctly applied the relevant standards and the site plan satisfies those standards."
*Hessee Realty, Inc. v. City of Ann Arbor*, 61 Mich.App. 319, 325, 232 N.W.2d 695 (1975).

conclusion that the "City threatened to refuse the building permit . . . unless another name was used," is even more incredible.

It is ironic that Judge Merritt finds a First Amendment violation in this case. The City Council members, particularly Councilman Thomas, were merely exercising their own First Amendment rights in expressing concern over a racially offensive name. Judge Merritt brands the Ann Arbor City Council members as violators of the First Amendment. It is clear that the City Council members at all times acted responsibly and within the law. Indeed, they would have been derelict in their duties as elected representatives had they *not* addressed the offensiveness of the name "Sambo's." Judge Merritt would have the City Council ignore the racially offensive name "Sambo's" altogether.

## IV

Judge Celebreeze bases his decision on two separate reasons. First, Judge Celebreeze argues that Sambo's stipulation not to use the name "Sambo's" was non-binding. Second, Judge Celebreeze concludes that no valid waiver occurred because Sambo's had no clearly established constitutional right to use its name in 1972.[13]

## A

In *Overmyer v. Frick*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972), the Su-

preme Court assumed without deciding that a valid waiver of constitutional rights in a corporate property case must be "voluntary, knowing and intelligent." [14] While there was adequate consideration in *Overmyer*, the Court's decision was not based solely upon this factor. Instead, the Court noted that since the party waiving its constitutional rights was represented by counsel, it waived those rights with full awareness of the legal consequences. The Court also noted that its conclusion that a valid waiver had occurred might be different if the contract was one of adhesion, where there was great disparity in bargaining power, or where the waiving party received nothing for the waiver.[15] Since the waiver in *Overmyer* was voluntary, knowing, and intelligent, and none of these factors were present, the Court held that the waiver was valid.

Nothing in *Overmyer* or in the cases applying *Overmyer* suggests that a valid waiver requires consideration. The presence or absence of consideration is a factor that can be weighed in determining whether a waiver was knowing and voluntary. *See Overmyer, supra* at 186–7, 188, 92 S.Ct. at 782, 783.[16] Judge Celebrezze, however, raises this factor to an absolute requirement.

Judge Celebrezze's opinion has dangerous precedential value in civil cases. A corporation, for example, may knowingly, voluntar-

**13.** The basis for Judge Celebrezze's decision was neither briefed nor argued in the district court or this court.

**14.** See my comments in note 2, *supra.* The Court in *Overmyer* did not specifically hold that a high waiver standard applied in a corporate property case. Rather, it assumed this without deciding.

**15.** Commentators have also emphasized the importance of these factors in the *Overmyer* holding. These appears to be almost unanimous agreement that the Court in *Overmyer* would not have found the waiver to be valid if the case involved a contract of adhesion or unequal bargaining power. *See, e. g.,* Comment, *Judgments—A Cognovit Clause Is Not Per Se, Violative of Fourteenth Amendment Due Process, D. H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124

(1972), 41 U.Cinn.L.Rev. 741 (1972); Finkin, *The Limits of Majority in Collective Bargaining,* 64 Minn.L.Rev. 183, 252 (1980) ("In a civil setting, the requirement of voluntariness has meant that there be at least a rough equality of bargaining power between the parties."); Yudof, *Reflections On Private Repossession, Public Policy and the Constitution,* 122 U.Pa.L.Rev. 954, 959 (1974) ("[*Overmyer Court*] intimated strongly that [a voluntary, knowing and intelligent waiver] would seldom be the case in consumer transactions where the inequality of bargaining power between the parties is legendary.").

**16.** The presence of equal bargaining power may also indicate that the waiver was voluntary. *See* Finkin, *supra.*

ily and intelligently agree to consent to suit in a forum where the due process requirements of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), could not have been met. If, as a matter of state contract law there was inadequate consideration for that waiver, Judge Celebrezze's opinion would find that the waiver was invalid even though it was knowing and voluntary. Therefore, an agreement to consent to personal jurisdiction could not be motivated by moral consideration. Nor could this agreement be enforced upon the basis of either detrimental reliance or an unjust enrichment theory. This same reasoning would also invalidate a party's otherwise valid waiver of its Seventh Amendment right to a jury trial. None of these anamalous results are required by *Overmyer*.

The presence of adequate consideration was only one factor consider in *Overmyer*. As the Court noted, a waiver would probably not be valid if a contract of adhesion or unequal bargaining power was involved. Nor would it be valid if the waiving party received no benefit. These factors should be considered in determining whether a knowing and voluntary waiver is valid. In the above example, if the corporation's consent to suit was not the result of a contract of adhesion or unequal bargaining power, then that consent should be valid as long as it was knowing and intelligent. Similarly, the consent would be valid unless the corporation received no benefit for its consent. This same analysis can be applied to a waiver of the right to a jury trial.

In criminal cases, an absolute requirement of consideration will eviscerate the waiver doctrine. For example, a defendant may knowingly, voluntarily and intelligently confess even though he received his *Miranda* warning when arrested. While the defendant received nothing for his confession, the State obtains a conviction that may not have been possible absent the confession. The presence or absence of consideration should not be important since the defendant acted voluntarily.

In the instant case, it is clear that Sambo's acted voluntarily and knowingly. Sambo's and the City Council knew that Sambo's had a right under state law to the use of its name. Sambo's was represented by counsel at all times. Thus, the waiver was the result of a carefully considered business decision.

It is also clear that none of the factors prohibited by *Overmyer* are present in the instant case. The agreement between Sambo's and the City Council was not a contract of adhesion. Nor can it be argued that there was unequal bargaining power between the corporation and the Council. Finally, there is no question that Sambo's benefited from the agreement not to use its name. Its decision not to use the name "Sambo's" insulated it from the adverse public reaction that would have inevitably resulted.

Since the waiver in the instant case was voluntary and knowing, and since none of the factors prohibited by *Overmyer* are present here, the presence or absence of consideration is irrelevant in deciding whether the waiver was valid. Therefore, I would not reach the state law issue of whether Sambo's waiver was binding as a matter of state contract law. That separate state law claim can be adjudicated in the state courts.

**B**

Judge Celebrezze also argues that no valid waiver occurred because Sambo's had no clearly established constitutional right to use its name in 1972. While Judge Celebrezze's position is superficially plausible, I think that his reliance upon *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), is misplaced. The facts of the instant case are distinguishable from *Butts*.

In *Butts*, the plaintiff sued the *Saturday Evening Post* for libel. The defendant publication did not raise any constitutional law defenses at trial, but defended solely on state law grounds. The jury ruled in favor of the plaintiff. While the case was on appeal, the Supreme Court decided *New*

*York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The court of appeals in *Butts* concluded that the defendant had waived its right to argue the constitutional law question advanced by *New York Times v. Sullivan*. The court emphasized that the First Amendment question in libel cases had been raised in concurring and dissenting opinions for many years and by commentators. The court also noted that counsel for the defendant in *Butts* were members of the same law firm that had defended the *New York Times v. Sullivan* case. *Curtis Publishing Co. v. Butts*, 351 F.2d 702, 734 (5th Cir. 1965). The Supreme Court disagreed. It did not think that the state of the law was so clear that it was unreasonable for an attorney to rely only on state law defenses prior to *Sullivan*. Moreover, such reliance was reasonable even for an attorney familiar with *Sullivan* as it made its way to the Supreme Court.

There is one critical distinction, however, between *Butts* and this case. In *Butts*, the defendant had no reason to waive at trial its constitutional defenses to the libel action brought against it. The constitutional defense was an additional ground on which the jury could have ruled in the defendant's favor. In addition, the defendant promptly raised its constitutional defense when *New York Times v. Sullivan* was decided. In this case, it is irrelevant whether Sambo's had First Amendment rights in 1972 to the use of its name. Sambo's had a clear right to the use of its name as a matter of state zoning law.[17] There was no legal basis for the Ann Arbor City Council to deny Sambo's the use of its name. Despite this, Sambo's agreed not to use its name. The existence or non-existence of federal First Amendment rights would not have affected Sambo's decision. It waived its rights to avoid controversy. That incentive existed regardless of its right under federal constitutional law.

Sambo's thus made a voluntary and knowing waiver of its right to use the name "Sambo's" at its Ann Arbor restaurant.

This is all that should be required to find a valid waiver. The fact that the plaintiff may have been unaware that it had an additional right to use its name under federal constitutional law was and is irrelevant to the waiver under these peculiar facts.

I note an additional factor. In *Butts*, the defendant magazine raised the First Amendment libel defense immediately after *Sullivan* was decided. In this case, Sambo's did not raise any First Amendment or other claim until December of 1978 when it made the business decision that the restaurant would operate more profitably under the name "Sambo's."

In sum, the circumstances of this case are distinguishable from the holding in *Butts* where the defendant magazine would clearly not have waived its rights had it known of the impending change in the law.

I have one final comment. Judge Celebrezze's rationale is so sweeping that it amounts to a *per se* holding that no pre-1976 waiver of commercial speech First Amendment rights is valid. This holding will lead to absurd results. For example, assume that Sambo's had agreed not to use the same "Sambo's" in exchange for valuable consideration. Judge Celebrezze's opinion would allow Sambo's to now rescind its decision, even though it was originally entered into voluntarily and for valuable consideration. Judge Celebrezze's opinion jeopardizes any pre-1976 contract between a company and a municipality which may in any way infringe on commercial speech.

## V

Sambo's made a business decision and agreed to forego the use of its name at its Ann Arbor restaurant. Today, the majority lets Sambo's escape from its business decision. This corporation should not be able to unilaterally ignore the reasonable agreement it entered into.

---

**17.** See *Hessee Realty, Inc. v. City of Ann Arbor, supra.*